<u>IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA</u>

| | |
|---|---|
| UNITED TECHNOLOGIES CORPORATION,<br>PRATT & WHITNEY DIVISION,<br>400 East Main Street<br>East Hartford, CT  06108<br><br>       Plaintiff,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF<br>DEFENSE,<br>1000 Defense Pentagon<br>Washington, DC  20301-1000,<br><br>and<br><br>DEFENSE CONTRACT MANAGEMENT<br>AGENCY,<br>6350 Walker Lane<br>Alexandria, VA  22310-3241<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR
<u>DECLARATORY AND PERMANENT INJUNCTIVE RELIEF ("REVERSE-FOIA")</u>**

Plaintiff United Technologies Corporation, Pratt & Whitney Division ("P&W"), by counsel, files this complaint for declaratory and permanent injunctive relief against the United States Department of Defense and the Defense Contract Management Agency, and states as follows:

**<u>NATURE OF THE ACTION</u>**

1.      This action arises from the recent decision of the Defense Contract Management Agency ("DCMA"), a subagency of the United States Department of Defense ("DOD"), to

release certain confidential quality system information obtained from P&W to a newspaper reporter pursuant to a Freedom of Information Act ("FOIA") request. P&W requests the Court to declare that the information in question constitutes confidential commercial information that is exempt from disclosure under FOIA Exemption 4 and prohibited from disclosure by the Trade Secrets Act. P&W also requests the Court to permanently enjoin DOD and DCMA from releasing the information. P&W is not seeking a preliminary injunction at this time because the applicable regulations prohibit release of the information "until the outcome of [this] court action is known," 32 C.F.R. § 286.25(e), and DCMA has represented that it will not release the information until the Court rules so long as P&W initiates this action by November 23, 2005.

## PARTIES

2.  Plaintiff United Technologies Corporation is a Delaware corporation with its principal place of business in Hartford, Connecticut. P&W is a division of United Technologies Corporation.

3.  Defendant DOD is a Department of the Executive Branch of the United States Government. DOD is responsible for and controls the DCMA.

4.  Defendant DCMA is a subagency of DOD with its headquarters at 6350 Walker Lane, Alexandria, Virginia. The Defense Contract Management Agency-East ("DCMA-East") is a regional office of DCMA with its headquarters at 495 Summer Street, Boston, Massachusetts. DCMA-East has custody and control of the information at issue, and issued the letter to P&W in which it proposed to release that information to the requester. P&W is not entitled to appeal DCMA-East's action within DCMA or DOD, and has therefore exhausted its administrative remedies.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, including FOIA and the Trade Secrets Act. Plaintiff also invokes this Court's authority to issue declaratory judgments under 28 U.S.C. § 2201-2202. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (e).

## STATEMENT OF FACTS

6.      P&W manufactures aircraft engines for both military and civilian aircraft, and also provides spare parts and services for such engines. P&W's primary product offerings in the military engine market are the F100-PW-220 and PW-229 engine models. These engines are sold to the United States Government for use in its F-16 and F-15 aircraft, and are also operated and flown all over the world by 20 international Air Forces and Governments in their F-16 and F-15 aircraft.

7.      P&W's primary competitor in the military engine market is General Electric Aircraft Engines ("GE Aircraft Engines"). The P&W F100 engine models have been engaged in numerous and intense competitions with the GE engine models in their thrust class. Currently, P&W is engaged in fierce competitions against GE Aircraft Engines in the international fighter aircraft market in at least seven countries.

8.      P&W's civilian engine family includes a number of models being considered by airlines around the world. P&W's largest commercial engine, the PW4000, powers the Boeing B777, B767 and B747 aircraft as well as the Airbus A330 and A300 aircraft versions. It is currently being competitively evaluated by airlines in eleven different countries. P&W's PW6000 engine is a smaller engine powering the Airbus A318 aircraft. This engine is currently

3

competing for sales in seven different countries. P&W's primary competitors in the civilian, *i.e.*, commercial, aircraft engine markets are GE Aircraft Engines and Rolls-Royce. The competition in those markets is very intense.

9. P&W's Commercial Services operating units are located all over the world, and provide overhaul of engines and repair of engine parts for numerous airline operators and other maintenance centers. Competition in this market is very intense, and sourcing decisions are made by the commercial maintenance purchasing departments every day. P&W's competitors in the commercial maintenance and repair market are numerous, with primary competitors being Lufthansa Technik and Chromalloy, among many others.

10. P&W contracts with units of DOD to supply military aircraft engines, spare parts, and associated services. P&W's contracts do not provide for unscheduled DCMA audits of P&W's quality systems. Nevertheless, P&W voluntarily cooperated with the following unscheduled quality system audits conducted by DCMA-East during 2004: the audit of the P&W Engine Center in Middletown, Connecticut, on November 8-10, 2004 (the "Engine Center Audit"); the Weld Wire Audit, conducted on July 9, 2004; and the Manufacturing Fixture Control Audit, conducted on September 8, 2004.

11. DCMA-East personnel took photographs of P&W's proprietary and commercially sensitive operations during the Engine Center Audit. DCMA-East also obtained substantial information from P&W concerning its proprietary quality control systems and procedures during that audit. DCMA-East included this information in a report on the Engine Center Audit (the "Engine Center Audit Report"), to which it attached the reports of its earlier Weld Wire Audit and Manufacturing Systems Control Audit.

12. On December 8, 2004, DCMA-East issued a Corrective Action Request ("CAR") to P&W based upon the Engine Center Audit. The CAR included much of the information obtained from P&W during the Engine Center Audit and included in the Engine Center Audit Report. DCMA-East referred to the CAR as a "Level III CAR" because of the positions held by the P&W officials to whom it was addressed.

13. DCMA-East sent the Level III CAR and the Engine Center Audit Report by e-mail to P&W executives and to certain officials within DOD. These e-mails included and summarized information in the Level III CAR and the Engine Center Audit Report.

14. On the same day that it issued the Level III CAR to P&W, DCMA-East briefed P&W on the Engine Center Audit. DCMA-East provided P&W with a document during this briefing that contained some of the photographs taken by DCMA-East during the Engine Center Audit along with captions that described what appeared in the photographs. This document is referred to as the "DCMA Briefing."

15. On December 15, 2004, Mr. John Moran, a reporter for the Hartford Courant newspaper in Hartford, Connecticut, submitted a FOIA request to DCMA-East requesting copies of the Engine Center Audit Report, the Level III CAR, and any other correspondence, reports, or documents connected with the Engine Center Audit.

16. DCMA-East informed P&W of Mr. Moran's FOIA request by letter dated January 28, 2005. In that letter, DCMA-East identified the following documents in DCMA-East's possession as responsive to the FOIA request: (1) the Engine Center Audit Report; (2) Pictures of Findings - Engine Center Audit; (3) the Reports of the Manufacturing Fixture Control Audit of September 8, 2004 and the Weld Wire Audit of July 9, 2004; (4) the December 8, 2004 Level III CAR; (5) the DCMA Briefing; (6) an email from DCMA-East employee Gene Contardi dated

November 11, 2004, regarding the Engine Center Audit; (7) an update from P&W dated November 11, 2004, regarding corrective actions taken in response to DCMA-East's Engine Center Audit findings; (8) an email from DCMA-East employee R. Buonanducci dated November 12, 2004, regarding Engine Center audit findings; (9) an email from DCMA-East employee Patrick Cassidy dated November 15, 2004, regarding the Engine Center Audit findings; (10) an email from DCMA-East employee Brent Downing dated November 17, 2004, regarding edits of audit findings; (11) two December 9, 2004 emails from DCMA-East employee Michael Klem regarding the Engine Center Audit and Level III CAR; and (12) P&W's December 13, 2004 response to the Level III CAR.

17.     DCMA-East's January 28, 2005 letter stated that it would "refuse to disclose trade secrets and commercial or financial information obtained from a source outside the Government which is privileged or confidential" under FOIA Exemption 4. The letter requested P&W to provide a detailed justification as to why the information deemed response to Mr. Moran's request was exempt from disclosure under FOIA Exemption 4. The letter advised P&W to discuss: (1) general industry custom with respect to the information at issue, (2) the number and position of persons who have or have had access to the information, (3) the nature and extent of commercial injury that would result from disclosure, and (4) the length of time that P&W deemed confidential treatment necessary. The letter gave P&W until February 28, 2005 to provide the requested evidence and analysis. This date was subsequently extended until March 24, 2005.

18.     On March 24, 2005, P&W sent a letter to DCMA-East with supporting affidavits and analysis explaining in detail why the information deemed responsive to Mr. Moran's request was exempt from disclosure under FOIA Exemption 4. P&W's affidavits provided the

information specifically requested by DCMA-East in its January 28, 2005 letter. P&W asserted that the information sought by Mr. Moran was exempt from disclosure because:

    a.    The information was voluntarily obtained from P&W and is not information of a kind that P&W customarily makes available to the public. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C. Cir. 1992);

    b.    Even if P&W was required to provide the information at issue, the information was nevertheless exempt from disclosure because its disclosure would "impair the government's ability to obtain necessary information in the future." *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974); and

    c.    Disclosure of the information would likely cause P&W substantial competitive harm because the information could be used by P&W's competitors to disparage P&W's products and proposals in the eyes of P&W's customers and potential customers and thereby to underbid P&W, resulting in lost sales. *National Parks*, 498 F.2d at 770.

19.     The affidavits submitted by P&W established that P&W voluntarily provided the information in the Engine Center Audit Report, the DCMA Briefing, the Level III CAR, and the related e-mails. These affidavits also demonstrated that P&W does not customarily make available the type of information contained in these documents to the public, that P&W's competitors in the Defense Industry have customarily treated such information as confidential and have not made such information available to the public, and that DCMA has also historically

7

treated such information as confidential and has not made such information available to the public.

20. P&W's affidavits also established that release of the information would force P&W to seriously consider taking measures to scale back the extent of its cooperation with unscheduled DCMA-East audits. Those measures could include: (1) challenging the DCMA-East's authority to conduct such audits; (2) ensuring that such audits are conducted in a manner that does not interfere with ongoing operations; (3) monitoring all discussions between DCMA-East and P&W floor employees; (4) insisting that the auditors' questions be reduced to writing; and (5) providing that all responses thereto be reviewed by P&W's management and counsel before being submitted to DCMA. The affidavits demonstrated that other DOD contractors would likely consider similar measures if they believed that the information in DCMA reports of quality system audits would be released to their competitors and the public. Such actions would impair DCMA's ability to obtain the same quality, reliability, and detail of information from P&W and other defense contractors in the future, thereby adversely affecting the effectiveness and efficiency of DCMA's quality control program.

21. P&W's affidavits further demonstrated that if DCMA-East disclosed the Level III CAR, P&W's response to the Level III CAR or the Engine Center Audit, or the related e-mails, P&W would be forced to seriously consider taking measures to scale back the extent of its openness and cooperation with DCMA. Those measures could include: (1) challenging more aggressively each CAR, thus requiring DCMA to specifically demonstrate why the subject of each CAR is contrary to a particular contract, military specification, etc.; (2) discontinuing or reducing the practice of inviting DCMA to participate in internal quality audits and meetings; and (3) discontinuing or reducing the practice of providing DCMA with access to internal

quality-related documents. Other DoD contractors would likely implement similar safeguards. Such actions would impair DCMA's ability to obtain information of comparable quality, reliability, and detail from P&W and other DoD contractors, compromising the effectiveness and efficiency of DCMA's quality control program.

22.     Indeed, P&W pointed out that DCMA-East had recently reached precisely this same conclusion in refraining to release this same type of information obtained from another defense contractor, Sikorsky Aircraft Corporation ("Sikorsky"), where DCMA-East stated that release of Sikorsky's CARs and responses to CARs "will significantly impair [DCMA's] future ability to obtain the same detail and quality of information from . . . DOD contractors in the future" and "will have an adverse impact on the efficiency and effectiveness of the DCMA Quality Assurance Program."

23.     The affidavits submitted by P&W established that P&W's competitors would use the information in the Audit Reports, the Level III CAR, the DCMA Briefing, and the related e-mails in their communications with customers and potential customers to undermine the credibility and reliability of P&W's quality control system, thereby making their own products and proposals more attractive to those customers in ongoing and future competitions. In doing so, they could underbid P&W in those competitions, thereby resulting in lost sales.

24.     Finally, the affidavits submitted by P&W established that the information at issue contained detailed descriptions of P&W's proprietary quality control processes, sensitive parts, and manufacturing procedures, and that, if this information were released, P&W's competitors could use it to gain insights into the strengths and weaknesses of P&W's proprietary quality control system and manufacturing techniques, allowing them to improve their own processes and proposals and thereby underbid P&W in future competitions, resulting in lost sales for P&W.

25. DCMA-East responded to P&W's March 24, 2005 submission on October 12, 2005. DCMA-East agreed that the photographs taken during the Engine Center Audit (including the photographs contained in the DCMA Briefing) and P&W's responses to both the Level III CAR and the Engine Center Audit findings were exempt from disclosure under *Critical Mass* because they were voluntarily obtained from P&W and were not information of a kind that P&W customarily makes available to the public. DCMA-East also found that some of the information in the Audit Reports regarding P&W's proprietary quality control procedures was exempt from disclosure under *National Parks* because its release would likely cause P&W substantial competitive harm. However, DCMA-East found that the information in the photograph captions, the Level III CAR, and most of the information in the Audit Reports and related e-mails was not voluntarily provided and was therefore not exempt under *Critical Mass*. DCMA-East also asserted, without explanation, that release of this information would neither impair the government's ability to obtain similar information in the future nor cause P&W substantial competitive harm. The letter advised P&W that DCMA-East would release the documents by October 26, 2005, unless P&W filed suit in federal court to prevent their release. P&W subsequently obtained an extension of this deadline until November 23, 2005.

26. On November 14, 2005, P&W requested DCMA-East to reconsider its decision that the information at issue should be released. P&W provided additional affidavits in support of its request for reconsideration. DCMA-East denied P&W's request for reconsideration in its entirety on November 21, 2005.

27. P&W will suffer irreparable harm from the release of the information at issue.

28. There will be no harm to the government from protecting the information at issue against the release to the public or to a FOIA requester.

29.     Protecting the release of the information at issue will serve the public interest by fostering fair competition, facilitating the effectiveness of DCMA's Quality Control program, and preserving the willingness of contractors to freely and voluntarily provide DCMA with information on their quality control systems.

## COUNT I
## (FOIA EXEMPTION 4)

30.     P&W hereby incorporates by reference paragraphs 1-29 above.

31.     The information at issue is confidential commercial information exempt from disclosure under FOIA Exemption 4, 5 U.S.C. § 552(b)(4). Release of the information by DCMA or DOD is therefore not in accordance with law under Section 706 of the APA, 5 U.S.C. § 706.

## COUNT II
## (TRADE SECRETS ACT)

32.     P&W hereby incorporates by reference paragraphs 1-29 above.

33.     The information at issue constitutes trade secrets under the Trade Secrets Act, 18 U.S.C. § 1905. Disclosure by DCMA or DOD of the information at issue is prohibited by the Trade Secrets Act and therefore not in accordance with law under Section 706 of the APA, 5 U.S.C. § 706.

## COUNT III
## (ARBITRARY AND CAPRICIOUS AGENCY ACTION)

34.     P&W hereby incorporates by reference paragraphs 1-29 above.

35.     DCMA's decision to release the information at issue is arbitrary and capricious under Section 706 of the APA, 5 U.S.C. § 706.

## COUNT IV
## (DECLARATORY JUDGMENT ACT)

36. P&W hereby incorporates by reference paragraphs 1-29 above.

37. This Court has authority pursuant to 28 U.S.C. §§ 2201-2202 to declare the rights of P&W with respect to the information at issue and DCMA's proposed actions, as follows:

    a. The information at issue is confidential commercial information, was voluntarily provided to DCMA, is customarily kept confidential by P&W, and therefore is protected by FOIA Exemption 4, 5 U.S.C. § 522(b)(4), and the Trade Secrets Act, 18 U.S.C. § 1905;

    b. The information at issue is confidential commercial information, there is currently actual competition, release or disclosure of the information likely would result in substantial competitive harm to P&W in current and/or future competitions for the same or similar products and services, and the information therefore is protected by FOIA Exemption 4, 5 U.S.C. § 522(b)(4), and the Trade Secrets Act, 18 U.S.C. § 1905; and

    c. DCMA's decision to release the information at issue is arbitrary, capricious, or otherwise contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## PRAYER FOR RELIEF

WHEREFORE, P&W respectfully requests the Court to:

(A) Declare that the information at issue is confidential commercial information, was voluntarily submitted to DCMA-East, and is customarily kept confidential by P&W, and is therefore protected by FOIA Exemption 4, 5 U.S.C. §§ 522(b)(4), and the Trade Secrets Act, 18 U.S.C. § 1905;

(B)     Declare that the information at issue is confidential commercial information, and its release or disclosure likely would cause P&W to suffer substantial competitive harm in current or future competitions for the same or similar products and services, and therefore the information is protected by FOIA Exemption 4, 5 U.S.C. § 522(b)(4), and the Trade Secrets Act, 18 U.S.C. § 1905;

(C)     Declare that DCMA's decision to release the information at issue is arbitrary, capricious, or otherwise contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706;

(D)     Permanently enjoin DOD, DCMA, and their officers, agents and employees, and those acting in concert with them, from disclosing the information at issue; and

(E)     Order such other and further relief as may be deemed just and proper by the Court.

Respectfully submitted,

/s/ Robert K. Huffman
ROBERT K. HUFFMAN (DC. BAR NO. 219915)
EMMETT B. LEWIS (D.C. BAR NO. 308627)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-5824
(202) 628-0858 facsimile

Attorneys for Plaintiff
United Technologies Corporation,
Pratt & Whitney Division

*Of Counsel:*

LESTER K. KATAHARA (D.C. BAR NO. 367691)
PRATT & WHITNEY MILITARY ENGINES
400 Main Street M/S182-30
East Hartford, CT 06108
(860) 565-5416
(860) 755-5878 (facsimile)

LEAH E. FRAZIER (DC. BAR NO. 492540)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-6086
(202) 628-0858 facsimile

Dated: November 23, 2005