## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action Number: 05-2271 (RWR)** |
| **UNITED STATES DEPARTMENT OF DEFENSE, et al.** | ) ) ) | |
| **Defendants.** | ) ) ) | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant hereby moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure because there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law.

In support of this motion, Defendant respectfully submits the attached memorandum of points and authorities with attachments, a statement of material facts not in genuine dispute, the Administrative Record compiled in this case, and a proposed order.

Respectfully submitted,

_____

KENNETH L. WAINSTEIN, DC Bar #451058
United States Attorney

_____

R. CRAIG LAWRENCE, DC Bar #171538
Assistant United States Attorney


_____

KEVIN K. ROBITAILLE
Special Assistant U.S. Attorney
555 4th Street, NW
Washington, D.C. 20530
(202) 353-9895

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED TECHNOLOGIES** ) | |
| **CORPORATION,** ) | |
| **PRATT & WHITNEY DIVISION** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action Number: 05-2271 (RWR)** |
| ) | |
| **UNITED STATES DEPARTMENT** ) | |
| **OF DEFENSE, et al.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this "reverse" Freedom of Information Act case plaintiff, Pratt & Whitney Division of

United Technologies Corporation ("P&W"), seeks to prevent defendant, the United States

Department of Defense, Defense Contract Management Agency ("DCMA"), from releasing to

the public documents related to DCMA audits of the quality system at P&W, which DCMA

intends to disclose with certain redactions.  Plaintiff's claims arise under the Administrative

Procedure Act, 5 U.S.C. §§ 702, et seq. ("APA"), and the Freedom of Information Act, 5 U.S.C.

§ 552, et seq ("FOIA").  In response to a FOIA request from a local newspaper, DCMA decided

to disclose certain records related to audits of plaintiff's quality system.  Specifically, plaintiff

challenges DCMA's decision to disclose portions of a November 2004 report of the audit of

P&W's Engine Center in Middletown, Connecticut and DCMA internal correspondence

regarding the audit; portions of reports of audits conducted in July and September of 2004 of

1

P&W's Weld Wire and Manufacturing Fixture Control processes; portions of a November 2004 briefing prepared by DCMA to inform P&W management of the results of the Engine Center Audit; Two December 8, 2004 Level III Corrective Action Request letters issued by DCMA to P&W senior management and DCMA email correspondence distributing the Corrective Action Requests to government personnel. Specifically, P&W contends that such a disclosure would violate FOIA Exemption 4 and the Trade Secrets Act.

As demonstrated below, and in the Administrative Record filed in this case, the Department has properly concluded that the information P&W seeks to have withheld must be released under the FOIA. Accordingly, summary judgment for defendant is appropriate in this case.

## FACTS

Defendant respectfully refers the Court to the Statement of Material Facts Which Are Not in Genuine Dispute filed herewith.

## ARGUMENT

I.     THIS COURT'S REVIEW OF THE DEPARTMENT'S RELEASE DECISION IN RESPONSE TO THIS FOIA REQUEST IS LIMITED TO THE ADMINISTRATIVE RECORD IN THIS CASE.

The Supreme Court's decision in Chrysler Corp. v. Brown, 441 U.S. 281, 317-18 (1979), established that a party's right to judicial review of an agency's decision to release records in response to a FOIA request arises under the APA. Accordingly, an agency's decision can be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" — the appropriately "narrow" standard for review of informal agency action under Section 706(2) (A) of the APA. See Camp v. Pitts, 411 U.S. 138, 142 (1973); Citizens to

2

Preserve Overton Park v. Volpe, 401 U.S. 402, 413-15 (1971).  As the Court of Appeals for this Circuit has explained, "[u]nder the arbitrary and capricious standard of review, [courts] do not 'substitute [their] judgment for that of the agency.'"  Bartholdi Cable Co. v. FCC, 114 F. 3d 274, 279 (D.C. Cir. 1997) (citation omitted); see also CNA Fin. Corp. v. Donovan, 830 F.2d 1132, 1153-54 (D.C. Cir. 1987).  Instead, the reviewing court should "look only to see whether the agency action reflects a 'clear error in judgment.'" Bartholdi Supra. (citations omitted); see also NOW v.  Social Security Admin., 736 F.2d 727, 745 (D.C. Cir. 1984) (per curiam) (Mikva J. & McGowan J., concurring).

This Court has previously addressed the limited scope of review to be applied in "reverse" FOIA cases, explaining that "where an agency wants to release information but the submitter of that information objects, the court may set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Under this deferential standard of review, a court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" McDonnell Douglas Corp. v. NASA, 895 F. Supp. 319, 325 (D.D.C. 1995) (quoting Overton Park, 401 U.S. at 416), vacated as moot, 88 F.3d 1278 (D.C. Cir. 1996) ("reverse" FOIA suit).

Applying these principles in the instant case, it is clear that the DCMA's decision to release the information related to the audits and Corrective Action Requests (CAR) cannot be regarded as "arbitrary and capricious" under the APA.  The administrative process in this case was thorough.  The Department accorded P&W repeated opportunities to present its arguments, and it carefully reviewed the information at issue to determine what information fell within FOIA's Exemption 4.  See Vaughn index of the information subject to withholding under FOIA

3

Exemption 4, DEX 1 attachment 1.

As explained below, the Administrative Record demonstrates that the Department's

decision is supported by the applicable law.

## II. THE FOIA IMPOSES AN AFFIRMATIVE OBLIGATION ON THE DEPARTMENT TO DISCLOSE ALL NONEXEMPT INFORMATION.

In accordance with Supreme Court decisions interpreting the FOIA, this Court has

observed that "[t]he basic policy of FOIA is one of disclosure." Martin Marietta Corp. v. Dalton,

974 F. Supp. 37, 40 (D.D.C. 1997) (citations omitted). Information is exempt from release under

the FOIA only if it is covered by one of the nine exemptions under the statute. See 5 U.S.C. §

552(b). Moreover, a submitter of information "seeking to prevent a disclosure the government

itself is otherwise willing to make assumes [the] burden" of justifying nondisclosure. Martin

Marietta, 974 F. Supp. at 40 n.4.

In this case, P&W is challenging DCMA's decision to disclose certain information related

to audits conducted by DCMA pursuant to contracts between the government and P&W that

DCMA has determined is not protected by Exemption 4. As this Court explained in Martin

Marietta, the FOIA's purpose is served by release of such information. See id. at 40-41 (citing

United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773

(1989)). In the words of this Court:

> In perhaps no sphere of governmental activity would [FOIA's] purpose appear to be more
> important than in the matter of government contracting. The public … is entitled to
> know just how and why a government agency decided to spend public funds as it did; to
> be assured that the competition was fair; and, indeed, even to learn how to be more
> effective competitors in the future.

Martin Marietta, 974 F. Supp. at 41. The public similarly is entitled to know that the government

4

got what it paid for and that a contractor is meeting its obligation to provide quality goods.

Thus, although P&W might "prefer that less be known about its operations," Martin

Marietta, 974 F. Supp. at 41, the Department's decision to release the information at issue, in the

absence of competitive harm, is in full accordance with the policy underlying the FOIA.

III.    THE DEPARTMENT CORRECTLY DETERMINED THAT
        EXEMPTION 4 OF THE FOIA DOES NOT PROHIBIT
        RELEASE OF THE DISPUTED INFORMATION.

Exemption 4 is not a general "privacy" exemption for companies who do not want certain

information to be publicly disclosed.  Indeed, corporations and business associations possess no

protectible privacy interests.  Sims v. CIA, 642 F.2d 562, 572 n.47 (D.C. Cir. 1980) rev'd in part

on other grounds 471 U.S. 159.  FOIA Exemption 4 protects "trade secrets and commercial or

financial information obtained from a person, [that is] privileged or confidential. 5 U.S.C. §

552(b)(4).  In order to bring a matter (other than a trade secret) within the orbit of FOIA

Exemption 4, it must be shown that the information is (a) commercial or financial, (b) obtained

from a person, and (c) privileged or confidential.  Nat'l Parks & Conserv. Assoc. v. Morton, 498

F.2d 765 (D.C. Cir. 1974).

The information being released by DCMA does not contain trade secrets as defined in

Exemption 4.  Case law in this circuit adopts a narrow definition of "trade secret." The D.C.

Circuit has stated "In our opinion, the term "trade secrets" in Exemption 4 of the FOIA should be

defined in its narrower common law sense, which incorporates a direct relationship between the

information at issue and the productive process. Accordingly, we define trade secret, solely for

the purpose of FOIA Exemption 4, as a secret, commercially valuable plan, formula, process, or

device that is used for the making, preparing, compounding, or processing of trade commodities

and that can be said to be the end product of either innovation or substantial effort. This

definition, we believe, hews more closely to the language and legislative intent of the FOIA than

does the Restatement approach." Public Citizen Health Research Group v. Food & Drug Admin.,

704 F.2d 1280, 1288-1289 (D.C. Cir. 1983).  In the administrative process, plaintiff alleged that

"details of P&W's proprietary quality control system and manufacturing techniques constitute

"trade secrets" for purposes of exemption 4."  AR 5-116 and 230-252.  DCMA agreed with

respect to information quoting or describing in detail P&W's quality control system and has

redacted those portions of the documents.  DEX 1 ¶ 17 and attachment 1.  The remaining

information discusses deficiencies in plaintiff's quality control systems found by DCMA audits.

It does not contain plaintiff's "plan, formula, process, or device that is used for the making,

preparing, compounding, or processing of trade commodities."

        Information failing to meet the definition of trade secret, may still be protected by

exemption four if it is commercial or financial information.  Unlike "trade secret" The term

"commercial information" is broad with the words given their ordinary meaning.  Public Citizen

Health Research Group v. Food & Drug Admin., 704 F.2d 1280, 1290 (D.C. Cir. 1983)

"Commercial information" includes not only information that reveals basic commercial

operations but also information in which the submitter has a "commercial interest".  Id. at 1290.

All of the responsive documents in this case relate to a quality assurance system employed at a

P&W engine manufacturing plant.  The information is considered private and confidential by

plaintiff.  Thus, the information sought is clearly "commercial" within the meaning of Exemption

4.

The relevant question thus becomes whether the information is confidential within the meaning of Exemption 4. In its en banc decision in <u>Critical Mass Energy Project</u> v. <u>NRC</u>, 975 F.2d 871 (D.C. Cir. 1992), the Court of Appeals for this Circuit established two distinct standards to be used in determining whether commercial or financial information submitted to an agency is "confidential" under Exemption 4. For information "voluntarily" submitted to the government, a new test was announced in the decision, such information is categorically protected provided it is not "customarily" disclosed to the public by the submitter. For information that is "required" to be submitted to the government, the test for confidentiality continues to be the one set forth in <u>National Parks & Conservation Association</u> v. <u>Morton</u>, 498 F.2d 765 (D.C. Cir. 1974).

**A. The Government had a Contractual Right to Obtain the Information**

Plaintiff seeks a declaratory judgment that "the information at issue is confidential commercial information, was voluntarily provided to DCMA, is customarily kept confidential by P&W and therefore is protected by FOIA Exemption 4, 5 U.S.C. § 552(b)(4) and the Trade Secrets Act, 18 U.S.C. § 1905. Compl. Prayer for Relief. To support its argument that the information contained in the documents at issue was provided voluntarily, plaintiff contends that P&W's contracts do not provide for "unscheduled" audits of its quality systems and therefore P&W's cooperation with the Government in the audits conducted in July, September, and November of 2004 was voluntary. Compl. ¶ 10. Defendant disagrees that the information contained in the documents at issue was voluntarily provided. Rather, the Government had a contractual right to audit plaintiff's quality system to determine that the system was acceptable for the production of aircraft engines to be sold to the U.S. military and flown by U.S.

7

servicemen and women.   DEX 1 ¶ 24.  Moreover, plaintiff's contracts do not prohibit the

Government from conducting "unscheduled" audits.  And, even if they did contain such a

requirement, the Government did provide advance notification prior to conducting the audits in

July, September, and November of 2004.  DEX 1 ¶ 25.

       In determining whether an information submission is mandatory or voluntary, the Court

of Appeals for the D.C. Circuit has established an objective test.  The Court held that "actual

legal authority, rather than parties' beliefs or intentions, governs judicial assessments of the

character of submissions."  Center for Auto Safety v. National Highway Traffic Safety

Administration, 244 F.3d 144, 149 (D.C. Cir. 2001).  In this case, the information concerning

P&W's quality system was obtained by Government inspectors from plaintiff during the course

of contractually authorized audits.  The Government's contractual right to audit P&W's quality

system is derived from the Inspection Clause that appears in every Government contract.  The

specific Inspection Clause contained in most contracts requiring the delivery of supplies (e.g.

aircraft engines), including contracts between DCMA and P&W, is Federal Acquisition

Regulation (FAR) Clause 52.246-2, Inspection of Supplies –Fixed Price, 48 C.F.R. 52.246-2.

Paragraph (b) of the clause requires the contractor to maintain an inspection system that is

acceptable to the Government and gives the Government the right to perform reviews and

evaluations necessary to ascertain compliance with the requirements of paragraph (b).  Paragraph

(b) states:

              (b) The Contractor shall provide and maintain an inspection system
              acceptable to the Government covering supplies under this contract
              and shall tender to the Government for acceptance only supplies
              that have been inspected in accordance with the inspection system
              and have been found by the Contractor to be in conformity with

8

contract requirements.  As part of the system, the Contractor shall prepare records evidencing all inspections made under the system and the outcome.  These records shall be kept complete and made available to the Government during contract performance and for as long afterwards as the contract requires.  **The Government may perform reviews and evaluations as reasonably necessary to ascertain compliance with this paragraph.  These reviews and evaluations shall be conducted in a manner that will not unduly delay the contract work.**  The right of review, whether exercised or not, does not relieve the Contractor of the obligations under this contract.  [Emphasis added].

48 C.F.R. 52.246-2.

Implicit in the exercise of the Government's right to conduct reviews is the understanding that the Contractor will cooperate during those reviews by making its facility available and by providing information about its quality system to the Government inspectors.  Thus, Plaintiff's assertion that P&W's participation in the audits was voluntary is baseless.  Plaintiff was in fact required by the terms of its Government contracts to submit to Government evaluation and review of its inspection system and its products.

Plaintiff seeks to characterize the information submissions as voluntary rather than mandatory by arguing that P&W's contracts do not call for "unscheduled" audits.  Compl. ¶37. FAR Clause 52.246-2 provides no basis to challenge the government's right to conduct a review simply because the audit was not scheduled in advance.  The only condition placed on the Government's reviews by the above-cited Inspection Clause language is that the reviews be "conducted in a manner that will not unduly delay the contract work."  However, the Inspection Clause does not require advance notice or establishment of a schedule before conducting such reviews.  48 C.F.R. 52.246-2.  At most, the clause gives plaintiff the right to object to the scheduling of an audit, not to the government's right to conduct the audit.  Absent an undue

9

delay, plaintiff had no contractual right to challenge even the timing of the audit.  The government clearly had a contractual right to conduct the audit and Plaintiff's cooperation, including the providing of information to the Government inspectors was required, not voluntary.

Finally, even if the Court could construe the above-cited language of the Inspection clause to require advance notification, defendant did in fact provide notification to P&W management prior to each of the three audits at issue.  With respect to the July 2004 audit of plaintiff's Weld Wire procedures, the Commander of the DCMA Office located at P&W, Lieutenant Colonel Peter Leahy, notified P&W Senior Vice President, Larry Moore, Quality Manager, Michael Pcholinski, and Vice President of Quality, Eileen Drake, of the upcoming audit in an email dated June 16, 2004.  Decl. of Peter Leahy, ¶ 2 (DEX 2).  With regard to the September 2004 audit of P&W's Manufacturing Fixture Control Procedures, Lieutenant Colonel Leahy notified Larry Moore of an upcoming audit in an email dated August 30, 2004.  DEX ¶ 2.  As to the November audit of P&W's Engine Center, Acting DCMA P&W Commander, Michael Klem, provided advance verbal notification on October 28, 2004, to P&W Quality Managers, Mark Allen and Michael Pcholinski. Decl. of  Michael Klem ¶ 2 (DEX 3).

Based on the foregoing, it is clear that P&W was required by the terms of its contracts to submit to audit of its quality system.  There is no requirement that the audit be scheduled in advance.  And, even if there were such a requirement, the Government did notify P&W of the upcoming audits prior to conducting them in July, September, and November of 2004.  For that reason, P&W's participation in the audit was mandatory and any information gained by the Government auditors during the course of the audit was required to be provided to the Government.

Under the <u>National Parks</u> test, commercial or financial information is considered to be confidential for purposes of Exemption 4 if disclosure of the information is likely to have either of the following effects: "(1) to impair the government's ability to obtain necessary information in the future or (2) to cause substantial harm to competitive position of the person from whom the information was obtained."  498 F.2d at 770.   Although plaintiff puts forth allegations regarding both of these prongs, it has not met the stringent standard imposed by FOIA that favors release.

**B.  Release Will Not Impair the Government's Ability to Collect Such Information in the Future**

Plaintiff contends that release of the information contained in the documents would impair DCMA's ability to obtain information of the same quality, reliability, and detail in the future and would adversely affect the effectiveness and efficiency of DCMA's quality control program. The government is in the best position to determine the effect of disclosure on future bidding situations. As a result, courts should defer to the administrative agency's determination that release will not cause impairment.  <u>McDonnell Douglas Corp. v. NASA</u>, 981 F. Supp. 12, 15-16 (D.D.C. 1997) rev'd on other grounds 180 F.3d 303, "if the agency is willing to release information, it can be safely assumed that the agency is acting to protect its ability to contract in the future." <u>Center for Public Integrity v. DOE</u>, 191 F. Supp. 2d 187, 196 (D.D.C. 2002).

Plaintiff claims that if information were released, it would have to seriously consider changing the way it responds to future audits.  Plaintiff suggested five ways in which it, or other contractors may hinder the government's ability to gather this information in the future.  DCMA addressed each of these claims and found they lack merit.

11

Plaintiff first suggests it would challenge DCMA's authority to conduct such audits. AR 9 and AR 32. P&W was required by the terms of its contracts to submit to DCMA evaluation and review of its inspection system and its products. See paragraph III A. above. Therefore, plaintiff could not challenge the Government's authority to conduct similar audits in the future. DEX 1 ¶ 15a.

Plaintiff next contends that it would ensure that such audits are conducted in a manner that does not interfere with ongoing operations. 48 C.F.R. 52.246-2 already prohibits the Government from unduly delaying the contract work when conducting reviews. P&W may request that an audit be rescheduled only if it causes undue delay, not for any other reason. DEX 1 ¶ 15b. Additionally, it is not in the government's interest to cause undue delay so the government would expect a contractor to inform it if its inspections would do so.

Plaintiff's third claim is that it would monitor all discussions between DCMA and P&W floor employees. Plaintiff is obligated to cooperate with the DCMA audit. DEX 1 ¶ 15c; 48 C.F.R. 52.246-2. The government expects, and P&W is contractually obligated to provide, accurate, truthful answers to the government's questions. DEX 1 ¶ 15c; 48 C.F.R. 52.246-2. Plaintiff does not explain how such monitoring would inhibit the government from getting the information. Monitored or not, plaintiff has the same obligation to provide the information.

Fourth, plaintiff argues that it would insist that auditors' questions be reduced to writing being submitted to DCMA. AR 9 and AR 32. However, there is nothing in the Inspection Clause that requires the Government to reduce to writing its audit questions. 48 C.F.R. 52.246-2 DEX 1 ¶ 15c. Plaintiff does not have the authority to require written submissions from DCMA auditors.

12

Finally, plaintiff suggests it will require that all responses be reviewed by P&W's management and counsel before being submitted to DCMA.  AR9 and AR 32.  Regardless of who is reviewing them, plaintiff would still be obligated to provide truthful responses.  DEX 1 ¶ 15d 48 C.F.R. 52.246-2.  Just as with monitoring employee communication, this may delay the government from receiving the information but would not hinder its ultimate receipt.

The government's ability to gather the information it needs to conduct audits comes from its contractual rights found in FAR Clause 52.246-2 and other similar clauses.  Plaintiff and other contractors cannot preclude the government from gaining this information without breaching their contracts.

### C.  Plaintiff Will Not Suffer Competitive Harm, as Defined in Exemption 4, from The Release of this Information

As to the second prong of the National Parks test, the Court of Appeals for the District of Columbia Circuit has emphasized that competitive harm in the FOIA context is limited to harm flowing from the affirmative use of proprietary information by competitors, not simply any injury to competitive position, as might flow from customer or employee disgruntlement.  Public Citizen Health Research Group v. FDA, 704 F2d 1280, 1291 n. 30 (D.C. Cir. 1983).   Plaintiff claims that its competitors would use the information contained in the audit to discredit P&W's quality control system in the eyes of P&W's competitors.  By doing so, P&W's competitors will make their own proposals and products look more attractive and could underbid P&W.  P&W claims that this would be especially harmful in international markets where the buyers are not likely to be familiar with DCMA quality audits and procedures and therefore unlikely to understand the significance of the particular findings in DCMA quality audit reports.  However,

13

unwarranted criticism of this type or embarrassment is not the kind of competitive harm

protected by Exemption 4.  It does not flow from the affirmative use of proprietary information.

See Occidental Petroleum Corp. v. SEC, 873 F.2d 325 (D.C. Cir. 1989);  This court addressed a

similar claim in Center to Prevent Handgun Violence v. United States Dep't of the Treasury, 981

F. Supp. 20, 23 (D.D.C. 1997).  In that case, The bureau of Alcohol, Tobacco and Firearms

argued that releasing reports would subject licensees to unwarranted criticism and harassment.

The Court rejected that argument, concluding "However that may be, the harm contemplated by

Exemption 4 is that which may flow from competitors' use of the released information, not from

any use made by the public at large or customers."   Center to Prevent Handgun Violence v.

United States Dep't of the Treasury, 981 F. Supp. 20, 23 (D.D.C. 1997); citing Public Citizen

Health Res. Grp. v. FDA, 704 F.2d 1280 (D.C. Cir. 1983).  Plaintiff's claims here are essentially

identical to those raised by the ATF.  The possibility that a P&W competitor might criticize

P&W to a customer is not an affirmative use of the proprietary information by the competitor.

The possibility of unfavorable publicity is insufficient for showing competitive harm.  See e.g.,

CNA Fin. Corp. v. Donovan, 830 F.2d 1132 (D.C. Cir. 1987).

McDonnell Douglas Corp. v. United States, 375 F.3d 1182, at 1189 (D.C. Cir. 2004) does

not change the analysis.  In submissions to DCMA, plaintiff contended that competitive harm of

any kind, including simple embarrassment, is sufficient to bring information within the

"competitive harm" prong of National Parks.  Plaintiff relied heavily on McDonnell Douglas for

the proposition that "underbidding includes making one's proposal more attractive to the

customer in ways in addition to price." AR 12-13.  However, the Court in McDonnell Douglas

addressed a competitors ability to use confidential information directly in the bid process to make

14

its proposal more attractive.  The Court did not contemplate the competitive tactic that P&W

postulates in this case, i.e., that a competitor would attempt to make its own products and

proposals look more attractive by simply directing customer attention to the shortcomings

described in the Government audits of P&W's Quality System.

    The issue in McDonnell Douglas was whether option prices under an already awarded Air

Force contract could be released.   McDonnell Douglas contended that release of the option

prices would cause substantial competitive harm because competitors would know how to

underbid them if the option years were re-competed.   But the Air Force rejected this position,

arguing instead that, because any re-competition would include factors other than price, the effect

of underbidding on price alone would be substantially diluted.  The District Court accepted the

Air Force argument and McDonnell Douglas appealed to the D.C. Circuit, pointing to a case of

its own (McDonnell Douglas v. NASA, 180 F.3d 303 (D.C. Cir. 1999) in which the D.C. Circuit

had soundly rejected the same argument.  The D.C. Circuit then agreed that the Air Force was

making the same argument that had been rejected in 1999, and ruled that the release of such

option prices was "contrary to law." Thus, it was only in the context of overruling the District

Court on this narrow point that the D.C. Circuit used the "more attractive" language on which

plaintiff relies:

        The District Court clearly used the term "underbid" to mean "bid a lower price",
        but that was not how we used that term in NASA;  there,

            "underbidding" refers to making a bid more attractive overall, not
            with respect only to price, so it will be chosen by the Government.
            See NASA, 180 F.3d at 303…. [Emphasis added].

15

Then, after making this observation, the court went on to state:

> … the agency there [in NASA] made the same argument as does the Air Force here, viz., that the NASA would not accept a bid merely because it offered a lower price but instead would consider nonprice factors in selecting the winning bid.  We rejected this argument summarily in NASA, and we reject it again here …

McDonnell Douglas, 375 F.3d at 1190.

Thus, McDonald Douglas involved the direct use of pricing information in forming a competitive proposal.  The language relied on by plaintiffs, stands only for the proposition that option prices may be protected under Exemption 4 even if a future competition would also involve factors other than price.  And, since it was only in this limited context that the court spoke of "…making a bid more attractive overall," this language cannot be read to encompass the tactic of making one's own proposal look better by simply pointing to the shortcomings exposed in an audit of a competitor's operation.

## CONCLUSION

Defendants' decision to release the requested documents with redactions is neither arbitrary, capricious nor contrary to law.  Rather the release of the documents is compelled by, and consistent with the goals of, the FOIA.

Respectfully submitted,

16

_____/s_____
KENNETH L. WAINSTEIN, D.C. Bar # 451058
United States Attorney


_____/s_____
R. CRAIG LAWRENCE, D.C. Bar # 171538
Assistant United States Attorney


_____/s_____
KEVIN K. ROBITAILLE
Special Assistant U.S. Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C.  20530
202-353-9895  / FAX 202-514-8780

17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION** ) ) ) ) | |
|     **Plaintiff,** ) ) | |
|   **v.** ) ) | **Civil Action Number: 05-2271 (RWR)** |
| **UNITED STATES DEPARTMENT OF DEFENSE, et al.** ) ) ) | |
|    **Defendants.** ) ) | |
| _____) | |

**ORDER**

   This matter comes before the Court on Defendant's Motion for Summary Judgment.

Based upon the motion, the opposition thereto, and the entire record herein, it is this ____ day of

_____, 20___ hereby

   ORDERED that Defendant's motion is GRANTED, and it is further

   ORDERED that judgment shall be entered for Defendant, and that this matter is

hereby DISMISSED WITH PREJUDICE.

   This is a final, appealable order.

SO ORDERED.

          _____
          Richard W. Roberts
          United States District Judge

Copies to:
The Parties via ECF