IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION <br><br> Plaintiff, <br><br><br> UNITED STATES DEPARTMENT OF DEFENSE DEFENSE CONTRACT MANAGEMENT AGENCY <br><br> Defendants. | ) <br> ) <br> ) CIVIL ACTION NO. <br> ) 1:05CV02271 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

1. I am Steven T. Bogusz, Deputy Director of the Defense Contract Management Agency East (DCMAE), located in Boston, Massachusetts. I have held this position since February 2003. The statements made herein are based upon my personal knowledge.

2. DCMAE is a component of the Defense Contract Management Agency (DCMA), located in Alexandria, Virginia. DCMA is the Department of Defense (DoD) Component that works directly with Defense contractors to ensure that DoD, Federal, and allied government supplies and services are delivered on time, at projected cost, and meet all contractual performance requirements.

3. DCMAE maintains resident offices at the facilities of a number of large Defense contractors. One such resident office is located at United Technologies, Pratt & Whitney Division, in East Hartford, Connecticut (hereinafter "P&W").

4. As the Deputy Director of DCMAE, one of my responsibilities is to make determinations regarding the release of records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

.-.-.4-2006 11:17  FROM:DCMAE-LEGAL. 6177533037                TO:DCMA-GUG                P:3

5. On December 15, 2004, DCMAE received a FOIA request from the *Hartford Courant* seeking the following documents related to DCMA audits of the quality system at P&W.

   a. A report on the findings of a DCMA audit at P&W Engine Center in Middletown, Connecticut, on November 8 through November 10, 2004.
   b. The Level III Corrective Action Request directed to P&W following that audit.
   c. Any other correspondence, reports, or documents connected with this audit.

6. Responsive documents totaling 352 pages and falling into the following six categories were identified: (1) A November 2004 Report of the Audit of P&W's Engine Center in Middletown, Connecticut and DCMA internal correspondence regarding the audit; (2) Reports of Audits conducted in July and September of 2004 of P&W's Weld Wire and Manufacturing Fixture Control processes; (3) Digital photographs taken by DCMA personnel during the performance of the November 2004 Engine Center Audit; (4) A November 2004 briefing prepared by DCMA to inform P&W management of the results of the Engine Center Audit; (5) Two December 8, 2004 Level III Corrective Action Request letters issued by DCMA to P&W senior management and DCMA email correspondence distributing the Corrective Action Requests to Government personnel; and (6) Correspondence from Pratt & Whitney to DCMA regarding the Engine Center Audit and the Level III Corrective Action Request letters.

7. On January 28, 2005, the DCMA Office of Counsel located in Hartford, Connecticut sent the documents to P&W for review pursuant to Executive Order 12600 and DoD FOIA Regulation 5400.7-R, C5.2.8. P&W was given 30 calendar days to present any objections concerning the release of the documents.

8. In February of 2005, P&W Office of Counsel verbally requested and was granted an extension to file its response until March 24, 2005.

9. P&W responded by letter dated March 24, 2005, contending that the information contained in the responsive documents was exempt from disclosure pursuant to FOIA Exemption 4, 5 U.S.C. § 552(b)(4). P&W made three arguments in support of its contention that the documents were exempt from disclosure. I reviewed the documents in conjunction with P&W's March 24, 2005 response. Each of P&W's arguments and my corresponding determination are discussed separately below.

10. First, P&W contended that the information contained in the documents was voluntarily provided and not the kind of information that P&W customarily makes available to the public.

11. With two exceptions, discussed below, I did not agree that P&W had voluntarily provided the information contained in the documents. Rather, I believe that P&W was required by the terms of its Government contracts to submit to a review of its quality system. Federal Acquisition Regulation 52.246-2, Inspection of Supplies, a standard inspection clause contained in most P&W Government contracts, requires P&W to maintain an inspection system that is acceptable to the Government and gives the Government the right to perform reviews and evaluations necessary to ascertain compliance. The information contained in the responsive documents is largely a compilation of the findings made by DCMA personnel during the course of their audits of the P&W quality system. The two exceptions referred to above were: (1) the digital photographs taken by DCMA personnel during the performance of audits at P&W's manufacturing facility; and (2) P&W's written responses to DCMA's December 8, 2004, Corrective Action Requests.

12. I agreed that the digital photographs taken by DCMA personnel during the conduct of the November 2004 Engine Center audit were obtained voluntarily from P&W and contained information that P&W would not customarily make available to the public. While P&W must, by the terms of its contracts, submit to a review of its quality system, there is no contract provision that gives the Government the right to take photographs in the P&W facility. P&W security procedures prohibit anyone from bringing a camera into the facility without prior approval or a P&W sponsor. Nevertheless, P&W allowed the Government inspectors to bring cameras into the Engine Center and to take digital photographs during the audit. The Government's use of cameras was solely within the discretion and control of P&W. Therefore, I determined that the photographic images were voluntarily provided by P&W. Since P&W tightly controls the use of cameras in its facilities, I also determined that the photographs contained information of a type that P&W would not itself release to the public. For these reasons, I determined that the digital photographs were not releasable to the *Hartford Courant*.

13. I also agreed with P&W that its written responses to DCMA's December 8, 2004, Corrective Action Requests were voluntarily provided. While P&W is required by the terms of its contracts to submit to review of its quality system, there is no contractual provision of which I am aware that requires P&W to provide a written response to a Corrective Action Request. All P&W must do is correct the quality system deficiencies identified by the Government. For that reason, I determined that any written responses provided by P&W were provided voluntarily. I also determined that these written responses relating to DCMA identified deficiencies in the P&W quality system were not information that P&W itself would release to the public. For these reasons, I decided that P&W's written responses to the Government's Corrective Action Requests were not releasable to the *Hartford Courant*.

14. Second, P&W contended that release of the information contained in the documents would impair DCMA's ability to obtain information of the same quality, reliability, and detail in the future and would adversely affect the effectiveness and efficiency of DCMA's quality control program. P&W claimed that if information were released, it would have to seriously consider changing the way it responds to future audits by:

    a. Challenging DCMA's authority to conduct such audits;
    b. Ensuring that such audits are conducted in a manner that does not interfere with ongoing operations;
    c. Monitoring all discussions between DCMA and P&W floor employees.
    d. Insisting that auditors' questions be reduced to writing; and
    e. Providing that all responses be reviewed by P&W's management and counsel before being submitted to DCMA.

15. I disagreed that release of the information contained in the documents would significantly impair DCMA's ability to obtain information of the same quality in the future. Addressing each of P&W's arguments, I determined the following:
    a. P&W was required by the terms of its contracts to submit to DCMA evaluation and review of its inspection system and its products. Therefore, P&W could not challenge the Government's authority to conduct similar audits in the future.
    b. FAR 52.246-2(b) gives P&W the right to ask the Government to reschedule an audit if the audit would unduly delay the contract work. P&W did not do so in the case of the audits conducted in July, September, and November of 2004. Therefore, I must assume that the contract work was not unduly delayed by the presence of DCMA auditors. If there was no undue delay of the contract work, P&W had no right to refuse the Government review.
    c. There is nothing to preclude P&W from monitoring all discussions between DCMA and P&W floor employees. But, that monitoring does not in any way eliminate P&W's obligation to cooperate in the audit.
    d. There is nothing in the Inspection Clause that requires the Government to reduce to writing its audit questions. Therefore, P&W cannot require written submissions from DCMA auditors.
    e. While P&W may require its personnel to obtain management and counsel review before responding to questions from DCMA inspectors, P&W may not unduly delay the Government's performance of an audit. Undue delay could result in a finding that the P&W's quality system is not acceptable to DCMA and a DCMA refusal to accept, on behalf of the U.S Government, product that is produced in accordance with that quality system. So, while P&W's proposed action might lengthen the DCMA review process, I did not believe that this would result in any significant impairment of DCMA's ability to perform its oversight of the P&W quality system.

16. P&W's third and final contention was that release of the information contained in the documents would likely cause significant harm to its competitive position. P&W claimed that its competitors would use the information to discredit P&W in the eyes of its customers. By doing so, P&W claimed that its competitors could make their own proposals and products look more attractive and could underbid P&W. P&W also claimed that certain documents contained detailed descriptions of P&W's proprietary quality control processes, sensitive parts, and manufacturing procedures, the release of which would permit P&W's competitors to gain insights into the strengths and weaknesses of P&W's proprietary quality control system and manufacturing techniques. P&W further contended that the details of its proprietary quality control system and manufacturing techniques constitute "trade secrets" for purposes of FOIA Exemption 4, the disclosure of which is presumed to cause substantial competitive harm to P&W's competitive position.

17. I agreed with P&W that release of any portions of the documents that quoted or described in detail P&W's quality control or manufacturing processes or procedures would likely result in substantial competitive harm to P&W. For that reason, DCMAE redacted those portions of the documents. The information remaining constituted DCMA's independent assessments of the deficiencies in P&W's quality system and procedures. While release of that information might cause embarrassment to P&W, such a result is insufficient to warrant withholding of the request information. I did not believe that the information could be affirmatively used by P&W's competitors to make their own proposals more attractive or to underbid P&W. Therefore, I concluded that the release of the remaining information would not likely result in substantial competitive harm to P&W.

18. By letter dated October 12, 2005, I notified P&W of my decision to release to the *Hartford Courant*, on October 26, 2005, portions of the responsive documents and attached a set of documents incorporating all proposed redactions. In that letter, I determined that the information contained in the reports of the November 2004 Engine Center Audit and related DCMA correspondence, the September 2004 Manufacturing Fixture Control Audit, and the July 2004 Weld Wire Audit, was not voluntarily provided to the Government by P&W but rather was required to be provided by the terms of P&W's contracts with the Government. I concluded that release of the same information would not impair the Government's ability to obtain from P&W (or any other contractors) essential information about their quality systems in the future. I further concluded that, with the exception of actual P&W quality system provisions which would be redacted, the release of the documents would not likely result in substantial competitive harm to P&W. With regard to the Level III Corrective Action Request (CAR) letters issued by DCMA on December 8, 2004 and related e-mail correspondence transmitting the CAR letters within the Government, I determined that their release would neither result in impairment of the Government or substantial competitive harm to P&W. Finally, with respect to the digital photographs taken in the P&W facility by

DCMA auditors, P&W's responses to the Level III CAR letters, and P&W's responses to the Engine Center Audit Report, I concluded that the information contained in the documents was both voluntarily provided by P&W, and not of a type that P&W would release to the public. For that reason, I notified P&W that DCMAE would not release that specific information.

19. On or about October 19, 2005, P&W requested and was given an extension to file suit from October 26 to November 23, 2005.

20. By letter dated November 14, 2005, P&W, through Counsel Robert Huffman of Miller & Chevalier, requested reconsideration of my October 12, 2005 decision.

21. The arguments made by P&W in support of its request for reconsideration were virtually the same arguments that P&W made in its submission of March 24, 2005. P&W asked DCMAE to make the following findings: (1) that the captions to the photographs in the DCMA Briefing to P&W were exempt from disclosure for the same reason that the photographs were determined by me to be exempt; (2) that the information in the Engine Center Audit Report and other Audit Reports, the Level III Corrective Action Request, and the related DCMA e-mails was voluntarily obtained from P&W and was therefore exempt from disclosure; (3) that release of the information contained in the Audit Reports, the Level III Corrective Action Request, and the related e-mails would impair DCMA's ability to obtain necessary information from P&W and other DoD contractors in the future and was therefore exempt from disclosure; and (4) that the information contained in the Audit Reports, the Level III Corrective Action Request, and the related e-mails was also exempt because its disclosure was likely to cause P&W substantial competitive harm.

22. To support its request that DCMAE withhold the captions to the photographs contained in the DCMA Briefing on the results of the November 2004 Engine Center Audit, P&W pointed to my October 12, 2005 determination that the photographs themselves should be withheld and argued that the captions should also be withheld. I disagreed. The photographs were withheld because DCMA had no right to bring a camera into the P&W facility without the permission of the contractor and therefore, the photographic images were determined to be voluntarily provided and not information that P&W itself would release to the public. What P&W refers to as the "captions" are the statements that DCMA placed below each picture to describe the conditions found by the DCMA Auditors during the November 2004 Audit. In my opinion, the "captions" contained DCMA's own independent assessments of the conditions that we observed during an Audit that was authorized by the terms of P&W's contracts with the Government. For that reason, I did not determine that the information contained in the "captions" was voluntarily provided by P&W.

23. To support its second request that DCMAE find that P&W voluntarily provided the information in the Engine Center Audit Report and other Audit Reports, the

Level III Corrective Action Request, and the related DCMA e-mails. P&W argued that "...while P&W's contracts require P&W to submit to scheduled DCMA audits of its quality assurance system, they do not require P&W to submit to unscheduled DCMA quality audits." P&W further argued that its own Quality Assurance System Procedures provide for advance notification by DCMA of all impending audits. I was not persuaded by either of P&W's arguments.

24. FAR 52.246-2, *Inspection of Supplies – Fixed Price*, requires contractors to provide and maintain an inspection system acceptable to the Government and authorizes the Government to perform reviews and evaluations as reasonably necessary to ascertain compliance with that requirement. While the Inspection Clause does state that these reviews and evaluations will be conducted in a manner that will not unduly delay the contract work, the Clause does not require advance notice or establishment of a schedule before conducting reviews. And, P&W has never contended that it objected to any of the audits on the grounds that they would unduly delay the contract work.

25. Further, I reviewed the pertinent provisions of P&W's quality system covering Customer Audits (PW-SLP-17.3). (Attached). Based upon that review, I did not agree that P&W's internal procedures required advance notification of impending audits. However, even if such advance notice was required, I believed that the Inspection Clause takes precedence over internal company procedures. Further, I learned that DCMA personnel at P&W did in fact provide courtesy notice to senior P&W management prior to each of the audits conducted in July, September, and November 2004, respectively. For all of these reasons, I concluded that P&W was required to submit to all of the DCMA audits at issue and therefore, the information provided by P&W was required to be submitted.

26. To support its third request that DCMAE withhold the records because their release would impair DCMA's ability to obtain necessary information from P&W and other DoD contractors in the future, P&W argued that my October 12, 2005, decision to release the records was arbitrary and capricious because it was inconsistent with an earlier DCMAE decision on a similar FOIA request for DCMA records regarding P&W's sister company, Sikorsky Aircraft Corporation. In that FOIA, Connecticut Channel 8 had requested copies of all the Corrective Action Requests issued by DCMA on the Sikorsky Black Hawk helicopter over a ten-year period. In that FOIA, then DCMAE Director, Keith Ernst, had decided to withhold all of the Corrective Action Requests because he had determined that their release would impair DCMA from obtaining the same quality and quantity of information from Sikorsky and other contractors in the future and would negatively impact the efficiency of the DCMA quality assurance program. Connecticut Channel 8 appealed Mr. Ernst's initial determination to withhold DCMA documents relating to the Sikorsky Black Hawk Helicopter. DCMA Headquarters subsequently reversed Mr. Ernst's initial determination, with the concurrence and agreement of Mr. Ernst. The basis for the reversal was a May 31, 2005, determination by Robert Schmitt, then DCMA Executive Director,

Contract Management Operations, that release of CARs would not result in a significant impairment. (Attached). Thus, my October 12, 2005, decision was not arbitrary, but instead was consistent with the DCMA Headquarters position.

27. With respect to P&W's fourth request that DCMAE withhold the records because their release would result in substantial competitive harm to P&W, I did not believe that P&W had offered sufficient evidence to establish substantial competitive harm. Undoubtedly, release of the information in the documents could cause some embarrassment to P&W because the documents discussed deficiencies in P&W's quality system. However, I did not see how P&W's competitors could use the information to underbid P&W or to make their own proposals and/or products better. For that reason, I concluded that release of the documents, as redacted, would not result in substantial competitive harm to P&W.

28. Based upon my review of P&W's November 14, 2005 request for reconsideration, I concluded that it did not provide any additional information to warrant a change to my decision of October 12, 2005, to release the specified documents as redacted.

29. By letter of November 21, 2005, I responded to Counsel for P&W and I reiterated the decision that I had rendered in my letter of October 12, 2005 and informed P&W that they must file suit by November 23, 2005 to prevent the release of the records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of January 2006

STEVEN T. BOGUSZ

Hartford Courant FOIA
Vaughn Index

| Doc # | Record Description | Doc Date | # of Pages | Disposition or Exemptions |
|---|---|---|---|---|
| 1 | P&W Response to Level III CAR Email from Klem to Takacs et. al. Subject: Level III Quality CAR Issued to P&W on Dec. 8, 2004 | 20041213 | 1 | Withhold in entirety under 5 U.S.C. 552(b)(4). Document is a Pratt & Whitney response to the Level III Corrective Action Request, was provided voluntarily, is deemed confidential, and is of a kind that the provider would not customarily make available to the public. |
| 2 | Email from Klem to Ques. Subject: Level III Quality CAR issued to P&W on Dec 8, 2004 | 20041209 | 1 | Release |
| 3 | Email from Klem to DCMA APO (P&W ALL). Subject: Level III Quality CAR Issued to P&W on Dec 8, 2004 | 20041208 | 1 | Release |
| 4 | | 20041209 | 1 | Release |
| 5 | DCMA Briefing to P&W (DCMA Engine Center Audit, November 2004) | 20041208 | 59 | Release with Redactions under 5 U.S.C. 552(b)(4). Redacted photographs depict observations made during the Engine Center Audit, were obtained voluntarily, and are of a kind that the provider would not customarily make available to the public. |
| 6 | Letter from Humerick to Moore Subject: Level III Corrective Action Request | 20041208 | 4 | Release |
| 7 | Letter from Humerick to Drake. Subject: Level III Corrective Action Request | 20041208 | 4 | Release with Redactions under 5 U.S.C. 552(b)(4) and Trade Secrets Act (18 U.S.C. 1805). Redacted items are quoted or paraphrased requirements taken from Quality System documents obtained from Pratt & Whitney and are considered confidential information the release of which would likely result in competitive harm. |
| 8 | Email from Downing to Olson. Subject: Engine Center Audit Report | 20041117 | 2 | Release with Redactions under 5 U.S.C. 552(b)(4) and Trade Secrets Act (18 U.S.C. 1805). Redacted items are quoted or paraphrased requirements taken from Quality System documents obtained from Pratt & Whitney and are considered confidential information the release of which would likely result in competitive harm. |
| 9 | Email from Cassidy to Olson. Subject: Engine Center Audit Findings [Email from Bounanducci to Olson. Subject: Please Review Audit Nov 8th 2004 | 20041115 | 1 | Release |
| 10 | | 20041112 | 6 | Withhold in entirety under 5 U.S.C. 552(b)(4). Document is a Pratt & Whitney response to the Engine Center Audit, was provided voluntarily, is deemed confidential, and is of a kind that the provider would not customarily make available to the public. |
| 11 | Email from Klem to Olson Subject: (BLANK) [Contains Email from Soucy to Klem Nov 11, 04 Audit Actions] | 20041112 | 2 | Release with Redactions under 5 U.S.C. 552(b)(4) and Trade Secrets Act (18 U.S.C. 1805). Redacted items are quoted or paraphrased requirements taken from Quality System documents obtained from Pratt & Whitney and are considered confidential information the release of which would likely result in competitive harm. |
| 12 | Email from Contardi to Olson. Subject: Engine Center Audit Finding | 20041110 | 1 | Release with Redactions under 5 U.S.C. 552(b)(4) and Trade Secrets Act (18 U.S.C. 1805). Redacted items are quoted or paraphrased requirements taken from Quality System documents obtained from Pratt & Whitney and are considered confidential information the release of which would likely result in competitive harm. |
| 13 | DCMA Engine Center Audit | 20041108-10 | 21 | |

# Hartford Courant FOIA
## Vaughn Index

| | | | |
|---|---|---|---|
| 14 | Pictures of Findings - Engine Center Audit | 20041108-10 | 237 | Withhold in entirety under 5 U.S.C. 552(b)(4). Withheld photographs depict observations made during the Engine Center Audit, were obtained voluntarily, and are of a kind that the provider would not customarily make available to the public. Additionally, some of the photographs contain competition sensitive details and configurations with sufficient detail to constitute "technical data" as defined in the International Traffic in Arms Regulations (ITAR) and are subject to export control laws of the United States. |
| 15 | Manufacturing Fixture Control Audit (Attached to Nov 04 Audit) | 20040908 | 4 | Release with Redactions under 5 U.S.C. 552(b)(4) and Trade Secrets Act (18 U.S.C. 1905). Redacted items are quoted or paraphrased requirements taken from Quality System documents obtained from Pratt & Whitney and are considered confidential information the release of which would likely result in competitive harm. |
| 16 | Summary, Unannounced Weld Audit, 7/1/2004 (Attached to Nov 04 Audit) | 20040701 | 6 | Release with Redactions under 5 U.S.C. 552(b)(4) and Trade Secrets Act (18 U.S.C. 1905). Redacted items are quoted or paraphrased requirements taken from Quality System documents obtained from Pratt & Whitney and are considered confidential information the release of which would likely result in competitive harm. |
| | | | 345 | |