IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF DEFENSE, et al.

Defendants.

Civil Action Number: 05-2271 (RWR)

**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff United Technologies Corporation, Pratt & Whitney Division ("P&W") hereby cross-moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure because there is no genuine issue as to any material fact and P&W is entitled to judgment as a matter of law. P&W also opposes Defendant's motion for summary judgment.

In support of this motion and opposition, P&W respectfully submits the attached memorandum of points and authorities, a statement of material facts not in genuine dispute, a counter-statement of facts, and a proposed order.

P&W respectfully requests the Court to hear oral argument on this motion and on Defendant's motion for summary judgment.

Respectfully submitted,

/s/ Robert K. Huffman
ROBERT K. HUFFMAN (D.C. BAR NO. 219915)
EMMETT B. LEWIS (D.C. BAR NO. 308627)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-5824
(202) 628-0858 facsimile

Attorneys for Plaintiff
United Technologies Corporation,
Pratt & Whitney Division

*Of Counsel*:

LESTER K. KATAHARA (D.C. BAR NO. 367691)
PRATT & WHITNEY MILITARY ENGINES
400 Main Street M/S182-30
East Hartford, CT 06108
(860) 565-5416
(860) 755-5878 (facsimile)

LEAH E. FRAZIER (D.C. BAR NO. 492540)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-6086
(202) 628-0858 facsimile

Dated: April 24, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION,<br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE, et al.<br><br>Defendants. | Civil Action Number: 05-2271 (RWR) |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
**WHICH ARE NOT IN GENUINE DISPUTE**

Pursuant to LCvR 7(h), Plaintiff United Technologies Corporation, Pratt & Whitney Division ("P&W") respectfully submits this statement of material facts which are not in genuine dispute in support of its cross-motion for summary judgment.

1. On December 15, 2004, a reporter for the Hartford Courant newspaper in Hartford, Connecticut submitted a Freedom of Information Action ("FOIA") request to DCMA-East ("DCMA") in which it requested a copy of the report of a quality system audit conducted by DCMA of P&W's Engine Center on November 8-10, 2004, a Level III Corrective Action Request ("CAR") that DCMA issued to P&W based upon the Engine Center audit, and other documents related to that audit. AR 02.

2. On January 28, 2005, DCMA counsel advised P&W of FOIA request and that it had identified the following documents as responsive to that request: (1) the Engine Center audit

report, including the reports from the Weld Wire and Manufacturing Fixture Control audits which were appended to it; (2) photographs taken by DCMA auditors during the Engine Center audit; (3) the Briefing; (4) the CAR; (5) P&W's response to the Level III CAR; and (6) various e-mails relating to the Engine Center Audit report, the Level III CAR, and P&W's response to it. AR 03-04, 63.

3. DCMA's January 28, 2005 letter requested that P&W address the following four factors pertaining to competitive harm in its response to the FOIA request: (1) "the general custom or usage in your business regarding this type of information;" (2) the number of persons who have, or have had, access to the information; (3) the type and degrees of commercial injury that disclosure of the information would cause; and (4) "the length of time you feel confidential treatment is warranted." AR 03-04, 11.

4. P&W responded by letter on March 24, 2005, asserting that the information that DCMA identified as responsive to the FOIA request was exempt from disclosure under FOIA Exemption 4. AR 5 - 116. Relying upon *Critical Mass Energy Project v. NRC*, 875 F.2d 871 (D.C. Cir. 1992), P&W asserted that the information was confidential because it was voluntarily provided and not the kind of information that P&W would customarily make available to public. P&W also asserted that Exemption 4 applied based upon *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) for two independent reasons: disclosure of the information would likely "impair the government's ability to obtain necessary information in the future and would cause "substantial harm to P&W's competitive position." AR 5-26. P&W submitted six affidavits in support of its response.

5. In response to the competitive harm first factor identified by DCMA in its January 28, 2005 letter, P&W's affidavits stated that it is industry-wide practice to treat such

information as confidential and to withhold it from third parties, and that DCMA similarly treats

that information as confidential.  AR 12, 17, 23.  In response to the second factor, P&W's

affidavits stated that it limits internal distribution of such information on a "need to know" basis.

AR 12, 17, 23.

6.      P&W addressed the third factor at greater length.  AR 12-14, 17-19.  Its affidavits

described the fierce competition in the domestic and international markets for military and

commercial aircraft engines and identified the harm to P&W's competitive position in those

markets that would result if the DCMA were to release the information in the Engine Center

audit report, the CAR, and the other documents responsive to the FOIA request.  AR 34-35, 38,

44-47, and 49-52.  Specifically, P&W's affidavits stated that P&W's competitors would use the

released information in their proposals and other communications with potential customers to

make their proposals more attractive and thereby underbid P&W.  AR 45-47 and 50-51.

7.      In response to the fourth factor identified by DCMA, P&W's affidavits stated that

confidential treatment would be required for at least 10 years.  AR 15, 18, 24.

8.      Citing *National Parks*, P&W asserted that release of the information would impair

DCMA's ability to obtain similar information from P&W and other DoD contractors in the

future.  AR 8-9, 16, 19, 21, 24.  P&W noted its cooperative and open relationship with DCMA,

and set forth the steps that it would take to lessen its cooperation with DCMA with respect to

unscheduled audits given the possibility that the information from those audits would be publicly

released.  AR 8-9, 16, 19, 21.  Those steps included:  (1) challenging DCMA's authority to

conduct such audits; (2) ensuring that such audits are conducted in a manner that does not

interfere with ongoing operations; (3) monitoring all discussions between DCMA and P&W

floor employees; (4) insisting that auditors' questions be reduced to writing; and (5) providing

that all responses thereto be reviewed by P&W's management and counsel before submission to DCMA. P&W therefore argued that release of the information would adversely impact the effectiveness of DCMA's quality control program. AR 8-9, 16, 19, 21.

9.      P&W submitted a letter from DCMA to another DOD contractor (and P&W affiliate), Sikorsky Aircraft Company, in which DCMA had determined "based upon discussions with DCMA quality assurance professionals" that disclosure of the information in CARs issued to Sikorsky "will significantly impair [DCMA's] ability to obtain the same detail and quality of information from [the contractor] and other DOD contractors in the future and will have an adverse impact on the efficiency and effectiveness of the DCMA Quality Assurance Program." AR 41. P&W asserted that DCMA's reasoning with respect to Sikorsky's CARs applied equally to the quality information obtained from P&W. AR 09-10.

10.     Finally, P&W asserted that no statute, regulation, or contract required it to (1) submit to the unscheduled Engine Center, Weld Wire, or Manufacturing Fixture Control audits, (2) permit DCMA auditors to bring cameras into its Engine Center and take photographs during the Engine Center Audit, or (3) respond to the Level III CAR issued by DCMA as a result of the Engine Center Audit. AR 7-8, 15-16, 20, 24. P&W relied in part upon its Quality Assurance System procedures, which provide for advance notification of all impending quality system audits. P&W therefore argued that it had voluntarily provided all information resulting from those audits. AR 7-8, 15-16, 20, 24. P&W further asserted that it did not customarily make such information available to the public. *Id.*

11.     DCMA issued a two-page decision on October 12, 2005, expressing its intent to release all of the information at issue except for the photographs, P&W's responses to the Level III CAR, and any information that described P&W's quality control or manufacturing processes

in detail. AR 117-18. DCMA decided to withhold the photographs and P&W's responses to the Level III CAR under *Critical Mass*; noting that it had voluntarily obtained that information because P&W had permitted DCMA auditors to take photographs during the audit and had submitted a written response to the Level III CAR, even though it was not required to do so. AR 117-18. Although DCMA decided to withhold the photographs, it decided to disclose their captions. DCMA also decided to redact information descriptive of P&W's quality control and manufacturing procedures on grounds that it would result in harm to P&W's competitive position. AR 117-18. DCMA determined that the release of the remaining documents "would not likely result in substantial competitive harm to P&W." AR 117.

12. P&W submitted a letter to DCMA on November 14, 2004, seeking reconsideration of the October 12, 2005 decision. AR 230-246.

13. DCMA issued a decision on November 21, 2005, which reaffirmed its previous determination to release the information that it proposed to release in its October 12, 2005 decision. AR 253-55.

Respectfully submitted,

/s/ Robert K. Huffman

ROBERT K. HUFFMAN (D.C. BAR NO. 219915)
EMMETT B. LEWIS (D.C. BAR NO. 308627)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-5824
(202) 628-0858 facsimile

Attorneys for Plaintiff
United Technologies Corporation,
Pratt & Whitney Division

*Of Counsel*:

LESTER K. KATAHARA (D.C. BAR NO. 367691)
PRATT & WHITNEY MILITARY ENGINES
400 Main Street M/S182-30
East Hartford, CT 06108
(860) 565-5416
(860) 755-5878 (facsimile)

LEAH E. FRAZIER (D.C. BAR NO. 492540)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-6086
(202) 628-0858 facsimile

Dated: April 24, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED TECHNOLOGIES CORPORATION, PRATT &WHITNEY DIVISION,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF DEFENSE, et al.

Defendants.

Civil Action Number: 05-2271 (RWR)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

ROBERT K. HUFFMAN (D.C. BAR NO. 219915)
EMMETT B. LEWIS (D.C. BAR NO. 308627)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, D.C. 20005-5701
(202) 626-5824
(202) 628-0858 facsimile
Attorneys for Plaintiff
United Technologies Corporation,
Pratt & Whitney Division

*Of Counsel*:

LESTER K. KATAHARA (D.C. BAR NO. 367691)
PRATT & WHITNEY MILITARY ENGINES
400 Main Street M/S182-30
East Hartford, CT 06108
(860) 565-5416
(860) 755-5878 (facsimile)

LEAH E. FRAZIER (D.C. BAR NO. 492540)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, D.C. 20005-5701
(202) 626-6086
(202) 628-0858 facsimile

Dated: April 24, 2006

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................ ii

ARGUMENT ........................................ 5

**I. THE INFORMATION THAT THE AGENCY PROPOSES TO RELEASE IS EXEMPT FROM DISCLOSURE UNDER FOIA EXEMPTION 4** ........................................ 5

A. Release Of The Information At Issue Would Likely Cause Substantial Harm To P&W's Competitive Position. ........................................ 6

B. Release Of The Withheld Information Is Likely To Impair DCMA's Ability To Obtain Necessary Information From P&W And Other DOD Contractors. ........................................ 11

**II. ALTERNATIVELY, THE AGENCY ERRED IN DETERMINING THAT THE INFORMATION AT ISSUE WAS NOT VOLUNTARILY OBTAINED FROM P&W AND THEREFORE EXEMPT FROM DISCLOSURE UNDER *CRITICAL MASS*** ........................................ 14

CONCLUSION ........................................ 17

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Scissors Corp. v. General Services Admin.*, Civil Action No. 83-1562, 1983 U.S. Dist. LEXIS 11712 (D.D.C. Nov. 15, 1983)....14, 15, 16, 17

*Artesian Industries, Inc. v. HHS*, 646 F. Supp. 1004 (D.D.C. 1986)....14

*CNA Fin. Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir 1987)....10

*Center to Prevent Handgun Violence v. U.S. Department of the Treasury*, 981 F. Supp. 20 (D.D.C. 1997)....9

*Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871 (D.C. Cir. 1992)....4, 5, 15

*McDonnell Douglas Corp. v. U.S. Department of the Air Force*, 215 F. Supp. 2d 200 (D.D.C. 2002), *rev'd on other grounds*, 375 F.3d 1182 (D.C. Cir. 2004)....7

*McDonnell Douglas Corp. v. U.S. Department of the Air Force*, 375 F.3d 1182 (D.C. Cir. 2004)....10, 11, 12, 13

*McDonnell Douglas Corp. v. NASA*, 981 F. Supp. 12, 15-16 (D.D.C. 1997), *rev'd on other grounds*, 180 F.3d 303....13

*Motor Vehicle Manufacturers, Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)....8

*National Parks & Conservation Association v. Morton*, 498 F.2d 765 (D.C. Cir. 1974)....4, 5, 11, 13, 14, 16

*Public Citizen Health Research Group v. Food and Drug Admin.*, 704 F.2d 1280 (D.C. Cir. 1983)....9

*Washington Post Co. v HHS*, 690 F.2d 252 (D.C. Cir. 1982)....14

## FEDERAL STATUTES

5 U.S.C. § 552(b)(4)....5

5 U.S.C. § 706(2)....14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED TECHNOLOGIES CORPORATION, PRATT &WHITNEY DIVISION,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF DEFENSE, et al.

Defendants.

Civil Action Number: 05-2271 (RWR)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

This is a "reverse" Freedom of Information Act ("FOIA") case in which Plaintiff United Technologies Corporation, Pratt & Whitney Division ("P&W") seeks an order setting aside and holding unlawful a decision by the United States Department of Defense, Defense Contract Management Agency-East ("DCMA" or "agency") to release certain information in DCMA audit reports and other documents that was obtained from P&W during DCMA's audits of the quality assurance systems at P&W's facilities. P&W and other DOD contractors treat such information as confidential because of its competitive sensitivity, and DCMA itself has historically not disclosed such information to third parties. In fact, this case and another pending case involving Sikorsky Aircraft Company (a P&W affiliate) are the only instances in which DCMA has proposed to release information obtained from a contractor in a DCMA quality audit

pursuant to a FOIA request.  P&W provided affidavits to DCMA demonstrating that it was engaged in numerous and fierce competitions for military and commercial aircraft engine customers, and that if DCMA released the information at issue, P&W's competitors would use that information to make their proposals more attractive and thereby underbid P&W for significant military and commercial aircraft engine business.  Administrative Record ("AR") 34-35, 45-47, and 50-51.  Nevertheless, despite this showing of substantial competitive harm, and DCMA's own finding in the Sikorsky case that release of contractor quality audit information would "significantly impair [DCMA's] ability to obtain the same detail and quality of information from [DOD contractors] in the future," DCMA summarily and arbitrarily concluded that release of the information at issue would not likely cause P&W substantial competitive harm and would not likely impair DCMA's ability to obtain necessary information in the future.  P&W was therefore required to bring this suit to protect its confidential information and to avoid the substantial competitive harm that would flow from its use by P&W's competitors.

## STATEMENT OF FACTS

P&W is a manufacturer of aircraft engines that competes in highly competitive markets for military and commercial jet engines.  AR 45, 49-50.  Because it contracts to sell aircraft engines to the U.S. government, P&W's quality assurance systems at its various facilities are audited by DCMA.  AR 30-31.

On December 15, 2004, a reporter for the Hartford Courant newspaper in Hartford, Connecticut submitted a FOIA request to DCMA requesting a copy of the report of DCMA's audit of P&W's Engine Center in November 2004, the Level III Corrective Action Request that DCMA issued to P&W following the audit, and other documents relating to the audit.  AR 02. On January 28, 2005, DCMA counsel advised P&W of the filing of the FOIA request and

notified P&W that DCMA had identified the following responsive documents:  (1) a report of the

DCMA quality system audit of P&W's Engine Center, which included as attachments two

reports of previous DCMA quality system audits of P&W facilities (the "Engine Center audit

report"); (2) photographs taken by DCMA auditors during the Engine Center audit; (3) a Briefing

given by DCMA to P&W management on the Engine Center Audit, which included some of the

photographs taken during the audit with captions (the "DCMA Briefing"); (4) the Level III

Corrective Action Request ("CAR") that DCMA issued to P&W on December 8, 2004, based

upon the Engine Center audit; (5) P&W's response to the CAR; and (6) various e-mails relating

to the Engine Center audit report, the CAR, or P&W's response.  AR 03-04, 63.  DCMA asked

P&W to provide a description of how disclosure of the requested documents would likely cause

substantial harm to P&W's present or future competitive position and specifically requested

P&W to address four factors related to competitive harm:  (1) "the general custom or usage in

your business regarding this type of information;" (2) the number of persons who have, or have

had, access to the information; (3) the type and degrees of commercial injury that disclosure of

the information would cause; and  (4) "the length of time you feel confidential treatment is

warranted."  AR 03-04.

      P&W submitted affidavits in response to DCMA's request demonstrating the existence of

fierce competition in the domestic and international markets for military and commercial aircraft

engines and the substantial harm to P&W's competitive position in those markets that would

result if the DCMA were to release the information in the Engine Center audit report, the CAR,

and the other documents responsive to the FOIA request.  AR 34-35, 38, 44-47, and 49-52.

Specifically, P&W's affidavits established that P&W's competitors would use the released

information in their proposals and other communications with potential customers to make their

proposals more attractive and thereby underbid P&W.  AR 45-47 and 50-51.  P&W's affidavits also addressed the other factors relevant to competitive harm identified in DCMA's letter.  AR 30-35, 38, 45-47, and 50-51.  Finally, P&W submitted a letter from DCMA to another DOD contractor, Sikorsky Aircraft Company, in which DCMA determined "based upon discussions with DCMA quality assurance professionals" that disclosure of the information in CARs issued to Sikorsky "will significantly impair [DCMA's] ability to obtain the same detail and quality information from [the contractor] and other DOD contractors in the future and will have an adverse impact on the efficiency and effectiveness of the DCMA Quality Assurance Program." AR 41.  P&W asserted that DCMA's reasoning with respect to the information in Sikorsky's CARs was equally applicable to the information in the documents pertaining to P&W's quality audits.  AR 09-10, 17, and 21.

On October 12, 2005, DCMA sent P&W a letter expressing its intent to release all of the information at issue except for the photographs, P&W's response to the CAR, and those portions of the remaining documents that described P&W's quality control or manufacturing processes in detail.  AR 117-118.  DCMA decided to withhold the photographs and P&W's response to the CAR under *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C. Cir. 1992), on the grounds that P&W was not required to submit this information to DCMA and that it was not the kind of information that P&W customarily made available to the public. AR 117.  DCMA also decided to redact information descriptive of P&W's quality control and manufacturing procedures on the grounds that its release would result in substantial harm to P&W's competitive position and was therefore exempt from disclosure under *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974).  AR 117.  DCMA found that release of the remaining information "would not likely result in substantial competitive harm" to

P&W and "will not impair the Government's ability to obtain from Pratt & Whitney (or any other contractor) essential information," and therefore was not exempt from disclosure under *National Parks*. AR 117.

P&W subsequently requested DCMA to reconsider its October 12, 2005 decision. AR 230-246. P&W reiterated its objections to disclosure and further asserted that DCMA's proposed redactions would not sufficiently mitigate the risk that release of the information would pose to P&W's competitive position. *Id*. DCMA denied P&W's request for reconsideration by letter dated November 21, 2005. AR 253-55.

P&W initiated this action on November 23, 2005, challenging DCMA's decision to release its information as arbitrary and capricious. The Department of Justice filed the Administrative Record and a motion for summary judgment on February 10, 2006

## ARGUMENT

### I. THE INFORMATION THAT THE AGENCY PROPOSES TO RELEASE IS EXEMPT FROM DISCLOSURE UNDER FOIA EXEMPTION 4

FOIA Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). The Department of Justice concedes that the information that DCMA proposes to release is commercial information obtained from P&W. DOJ Br. at 6. The Department also asserts that the disclosure decision is governed by *National Parks & Conservation Assoc. v. Morton*, 498 F.2d 765 (D.C. Cir. 1974). *Id.*[1] Under that decision, commercial information is considered

---

1 Pratt contends that the information at issue was voluntarily submitted and that its disclosure is therefore governed by *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C. Cir. 1992) rather than by *National Parks. See* Section II *infra.* However, if the Court finds that the information was required to be submitted, *National Parks* provides the governing standards.

"confidential" for purposes of Exemption 4 if its release (1) "is likely to cause substantial harm to the competitive position of the person from whom the information was obtained or (2) is likely to impair the government's ability to obtain necessary information in the future." *Id.* at 770. As we show below, release of the information at issue is likely both to substantially harm P&W's competitive position and to impair DCMA's ability to obtain similar necessary information from P&W and other DOD contractors in the future.

**A. Release Of The Information At Issue Would Likely Cause Substantial Harm To P&W's Competitive Position.**

DCMA identified four factors that it considered relevant in determining whether release of the information at issue would likely cause substantial harm to P&W's competitive position. AR 03-04. Those factors are: (1) the general custom or usage in P&W's business regarding this type of information; (2) the number and position of persons who have, or have had, access to the information; (3) the type and degrees of commercial injury that disclosure would cause; and (4) the length of time P&W felt confidential treatment is warranted. *Id.*

P&W submitted affidavits to DCMA addressing each of these factors. With respect to the trade usage factor, P&W's affidavits established that the general custom and usage in the defense industry is to treat the information in CARs, DCMA quality audit reports, and related documents as confidential and not to disclose that information to third parties. AR 30-34. With respect to the access factor, P&W's affidavits showed that P&W has consistently limited the persons who have access to the information in CARs, DCMA quality audit reports, and related documents to those within P&W with a "need to know." *Id*. With respect to the type and degree of commercial injury, P&W's affidavits demonstrated that if the information in the documents were released, P&W's competitors would use that information in their proposals and other communications with potential customers to discredit P&W's quality system and products and to

make their own proposals and products more attractive, thereby allowing them to underbid P&W. AR 45-47, 50-51. P&W's affidavits also established that release of the information would enable P&W's competitors to gain insights into the strengths and weaknesses of P&W's quality control system and manufacturing techniques, which would allow them to revise and improve their own quality control and manufacturing systems and thereby make their proposals and products more attractive, again permitting them to underbid P&W. AR 35. Finally, with respect to the length of time confidential treatment of the information would be required, P&W's affidavits explained that the information would have to be kept confidential for at least 10 years in order not to cause P&W substantial competitive harm. AR 47, 51.

Despite having identified the four factors discussed above as relevant in determining competitive harm, DCMA made no mention of those factors in its October 12, 2005 decision to release the information. Nor did DCMA even mention, much less address, P&W's affidavits. Instead, DCMA merely stated its "conclu[sion]" that "with the exception of the actual quality system provisions themselves, the release of the documents would not likely result in substantial competitive harm to [P&W]." AR 117.[2] Such conclusory statements "will not survive the arbitrary and capricious standard of review." *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 215 F. Supp. 2d 200, 203 (D.D.C. 2002), *rev'd on other grounds,* 375 F.3d 1182 (D.C. Cir. 2004). DCMA's decision to release the documents is also arbitrary and capricious because it (1) failed to consider the factors that it identified as relevant to the competitive harm analysis;

---

2 Likewise, in its November 21, 2005 denial of Pratt's request for reconsideration, DCMA stated that "[w]e have thoroughly considered all of the information provided by [Pratt] in its responses dated March 24, 2005 and November 15, 2005" and that "with the exception of the information that we have already redacted, we do not believe that [Pratt] has established the likelihood of substantial competitive harm flowing from [Pratt's] competitor's affirmative use of information contained the DCMA documents." AR 255.

(2) lacked any supporting evidence in the record for its conclusion; and (3) ignored the contradictory evidence in the record in the form of P&W's affidavits. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983). Accordingly, the Court should set aside DCMA's determination that release of the information would not likely cause substantial harm to P&W's competitive position and enter judgment in favor of P&W as a matter of law.

The Department of Justice asserts that DCMA's determination was reasonable because the harm that P&W would suffer from release of the information would not flow from the affirmative use of the released information by P&W's competitors, but would simply amount to "embarrassment." DOJ Br. at 13-14. That assertion is contradicted by P&W's affidavits. P&W affiants Raul Pereda and Michael Field testified that P&W's competitors would use the released information in their proposals and other communications with potential customers to discredit P&W's quality control system and to make their own proposals and products more attractive, thereby underbidding P&W and causing it substantial competitive harm. AR 45-47, 50-51. P&W affiant William Forthofer testified that the documents in question contain detailed descriptions of P&W's proprietary quality procedures, sensitive parts, and manufacturing processes and techniques, and that release of this information would enable P&W's competitors to gain insights into the strengths and weaknesses of P&W's quality control system and manufacturing techniques and to revise and improve their own quality control and manufacturing systems, thereby making their own proposals and products more attractive and allowing them to underbid P&W. AR 34-35.[3] Therefore, P&W's affidavits demonstrate that the harm from

---

3 P&W demonstrated in its request for reconsideration that DCMA's proposed redactions were insufficient to protect the confidentiality of P&W's quality procedures and manufacturing processes because P&W competitors could still ascertain those procedures and processes from the redacted pages. AR 200-01 and 239.

release of the information would not be "embarrassment," but rather would flow from the affirmative use of the released information by P&W's competitors.  The agency's decision to release the information does not address this fact, and there is nothing in the administrative record that even addresses, much less disputes, this fact.  As a consequence, the Department of Justice cannot now dispute this fact.

Furthermore, the cases on which the Department relies in arguing that P&W would suffer only "embarrassment" make clear that the competitive harm flowing from a competitors' affirmative use of the released information is not "embarrassment."  For example, in *Center to Prevent Handgun Violence v. U.S. Dep't of the Treasury*, 981 F. Supp. 20 (D.D.C. 1997)**,** the Bureau of Alcohol, Tobacco and Firearms ("ATF") argued that releasing certain information in reports submitted to the AFT by gun dealer licensees "would subject [the] licensees to unwarranted criticism and harassment."  *Id*. at 23.  The court rejected this argument on the grounds that the harm contemplated by Exemption 4 "is that which may flow from competitors' use of the released information, not from any use made by the public at large or customers."  *Id.*  Similarly, in *Public Citizen Health Research Group v. Food and Drug Admin.*, 704 F.2d 1280, 1291 n.30 (D.C. Cir. 1983), the court noted that "[c]ompetitive harm should not be taken to mean simply any injury to competitive position, as might flow from customer or employee disgruntlement or from the embarrassing publicity attendant upon public revelations concerning, for example, illegal or unethical payments to government officials or violations of civil rights, environmental or safety laws," but rather those types of injury "flowing from the affirmative use of proprietary information by competitors."  *Id* at 1291 n.30 (citations and quotations omitted).  Finally, in *CNA Financial Corp. v. Donovan,* 830 F.2d 1132, (D.C. Cir 1987), the court noted that "several of CNA's claims with respect to [certain] information relate not to alleged

competitive harm but rather to anticipated displeasure of its employees or to adverse public reaction," and concluded that "[t]hese proffered objections simply do not amount to 'harm flowing from the affirmative use of proprietary information by competitors,'" which it found to be covered by FOIA Exemption 4. *Id.* at 1154. Therefore, because P&W's affidavits make it clear that the likely competitive harm in this case would flow from the affirmative use of the released information by P&W's competitors, the cases relied upon by the Department establish that the likely harm in this case is covered by FOIA Exemption 4.

Finally, the Department challenges P&W's reliance on *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182 (D.C. Cir. 2004), for the proposition that a competitor could underbid P&W by making its proposal more attractive in ways in addition to price. DOJ Br. at 14-16. Although the Department acknowledges that the court of appeals stated in *McDonnell Douglas* that "underbidding refers to making a bid more attractive overall, not with respect only to price," *Id.* at 1189, it contends that this language "stands only for the proposition that option prices may be protected under Exemption 4 even if a future competition would also involve factors other than price." DOJ Br. at 16.

The Court should decline the Department's invitation to interpret the language in *McDonnell Douglas* to mean less than what it says. The court of appeals stated in *McDonnell Douglas* that "the district court clearly used the term 'underbid' to mean 'bid a lower price,' but that is not how we used the term in [*McDonnell Douglas Corp. v. NASA*, 180 F.3d 303 (D.C. Cir 1999)]." 375 F.2d at 1189. The court of appeals then stated its view that "underbidding" meant "making a bid more attractive overall, not with respect only to price, so it will be chosen by the Government." *Id.* at 1190. The court of appeals thus squarely rejected the Department's

argument in that case (and here) that "underbidding" means only to bid a lower price. The Court should not permit the Department to relitigate this issue.

**B. Release Of The Withheld Information Is Likely To Impair DCMA's Ability To Obtain Necessary Information From P&W And Other DOD Contractors.**

In addition to likely causing P&W substantial competitive harm, release of the information at issue is likely to impair DCMA's ability to obtain similar information from DOD contractors in the future and is therefore exempt from disclosure under the "impairment" prong of *National Parks.*

P&W submitted affidavits to DCMA describing the measures that P&W would consider taking to mitigate the competitive harm caused by DCMA's release of the information in the CAR and quality audit reports. AR 34. These measures include: (1) discontinuing or reducing P&W's practice of inviting DCMA auditors to participate in internal P&W quality audits and meetings; (2) discontinuing or reducing P&W's practice of providing DCMA with access to P&W's quality-related documents; (3) discontinuing or reducing P&W's practice of sharing the results of its internal corrective actions with DCMA except for what is required by contract; and (4) aggressively challenging each CAR audit, thereby requiring DCMA to specifically demonstrate how the subject of the CAR is contrary to a particular contract requirement. AR 34. Implementation of these and similar measures by P&W and other DOD contractors "would be detrimental to [the] open sharing of information and would foster an adversarial atmosphere between DCMA and contractors regarding quality-related problems and issues." AR 38. This would "impair DCMA's ability to obtain information of the same quality, reliability, and detail from [P&W] and other DOD contractors in the future." *Id. See also* AR 34.

At the time P&W submitted its affidavits, DCMA had determined in another FOIA case that "release of . . . CARs and [the contractor's] responses to them will significantly impair our

ability to obtain the same detail and quality of information from [the contractor] and other DOD contractors in the future and will have an adverse impact on the efficiency and effectiveness of the DCMA Quality Assurance Program."  AR 41.  DCMA made that determination in response to a FOIA request for CARs issued to Sikorsky Aircraft Company, an affiliate of P&W's.  *Id.*  DCMA based its determination that release of Sikorsky's CARs would likely impair DCMA's to obtain necessary information in the future on "discussions with Quality Assurance professionals within DCMA."  *Id.*  Although DCMA's October 12, 2005 decision in the case notes that its determination in Sikorsky's case "was subsequently reversed by then DCMA Executive Director, Contract Management Operations, Robert Schmitt, in a Memorandum for Record dated May 31, 2005" (AR 254), Mr. Schmitt's May 31 memorandum is not part of the Administrative Record, and his reversal in *Sikorsky* therefore cannot provide a basis for DCMA's decision to release P&W's CAR and related documents.  The mere fact that a contracts official in Washington has reversed DCMA in another case does not justify disregarding the judgment of DCMA's quality professionals that release of the information in CARs will impair DCMA's ability to obtain similar necessary information from DOD contractors and will adversely affect the efficiency and effectiveness of DCMA's Quality Program.

Apparently recognizing this problem, the Department of Justice has filed the Declaration of DCMA Deputy Director Steven Bogusz, which attaches Mr. Schmitt's May 31 memorandum and purports to provide a rationale for denying the likelihood of impairment in this case.  However, the Bogusz Declaration and its attachments are not part of the Administrative Record, and therefore cannot properly be considered in determining the reasonableness of DCMA's decision to release P&W's documents.  *See* Plaintiff's Motion to Strike Extra-Record Materials Submitted by Defendant to Provide a Rationale and/or Supporting Evidence For the Agency's

Decision, dated April 24, 2006.  Accordingly, the Court should reject the Department's efforts to "shore up" DCMA's unsupported finding of no impairment with extra-record materials.

The Department also asserts that the Court should defer to the government on the issue of impairment because "the government is in the best position to determine the effect of disclosure on future bidding situations."  DOJ Br. at 11, *citing McDonnell Douglas Corp. v. NASA*, 981 F. Supp. 12, 15-16 (D.D.C. 1997), *rev'd on other grounds*, 180 F.3d 303.  This argument begs the question of which government the Court is supposed to defer to:  DCMA's quality professionals, or a contracts official in Washington.  Furthermore, unlike the impairment alleged in *McDonnell Douglas*, the alleged impairment in this case does not concern "future bidding situations." Rather, it concerns the daily interaction between DCMA and P&W and other DOD contractors regarding the contractors' quality systems.  Therefore, the basis for deference stated in *McDonnell Douglas* — that "[g]overnment contracting involves millions of dollars and it is therefore unlikely that release of this information will cause [the government] difficulty in obtaining future bids" (981 F. Supp. at 15) — is absent here.

Furthermore, DCMA imposed the wrong legal standard in determining whether release of the information would likely impair DCMA's ability to obtain similar necessary information in the future.  DCMA stated that it "disagree[d] that release of the documents (as redacted) would *significantly* impair DCMA's ability to obtain necessary quality assurance system information from [P&W] and other contractors in the future."  AR 254 (emphasis in original).  However, the test imposed by *National Parks* is not whether release of the documents would "significantly impair" DCMA's ability to obtain necessary information in the future, but rather whether it "is likely to impair" that ability.  498 F.2d at 770.  By requiring P&W to demonstrate "significant"

impairment, DCMA has imposed a burden inconsistent with the statute, and its decision is thus "not in accordance with law." 5 U.S.C. § 706(2)(A).

Finally, in claiming that the impairment decision is one that is "solely within DCMA's purview," DCMA appears to imply that its decision lies beyond judicial review, a claim that even the Department does not make on its behalf. If that is DCMA's position, it is wrong. An agency's determination of no likely impairment must be set aside if the reviewing court finds it to be arbitrary, capricious, or not otherwise in accordance with law. 5 U.S.C. § 706(2)(A); *see also Washington Post Co. v HHS*, 690 F.2d 252, 269 (D.C. Cir. 1982) (agency decision to release information may be reversed if party seeking withholding produces a "detailed factual justification" showing that disclosure will impair the government's ability to acquire the information in the future); *Artesian Indus., Inc. v. HHS*, 646 F. Supp. 1004, 1009 (D.D.C. 1986) (same); *Am. Scissors Corp. v. Gen. Servs. Admin.*, Civil Action No. 83-1562, 1983 U.S. Dist. LEXIS 11712 at 2 n.2 (D.D.C. Nov. 15, 1983) (same). Here, P&W has made the "detailed factual" showing of likely impairment required by *Washington Post*, *Artesian*, and *American Scissors*. DCMA's conclusory determination of no impairment is unsupported by any evidence and is contrary to its own determination that release of the information in Sikorsky's CARs would impair DCMA's ability to obtain the same detail and quality of information from DOD contractors in the future. DCMA's determination of no impairment should therefore be set aside as arbitrary and capricious.

## II. ALTERNATIVELY, THE AGENCY ERRED IN DETERMINING THAT THE INFORMATION AT ISSUE WAS NOT VOLUNTARILY OBTAINED FROM P&W AND THEREFORE EXEMPT FROM DISCLOSURE UNDER *CRITICAL MASS*

In the event that the Court concludes that DCMA reasonably concluded that release of the information at issue is not likely to cause substantial harm to P&W's competitive position and is

not likely to impair DCMA's ability to obtain necessary information in the future, P&W respectfully requests the Court to find that P&W was not required to submit the information to DCMA and that the test imposed for voluntarily submitted information in *Critical Mass* therefore applies.

P&W submitted affidavits demonstrating that the information contained in each of the documents that DCMA proposed to release was voluntarily obtained from P&W. AR 30-34. P&W's affidavits demonstrated that P&W is not required by statute, regulation, or contract to submit to unscheduled DCMA quality audits and that P&W voluntarily permitted DCMA to conduct the unscheduled Engine Center audit in which the photographs and other information that DCMA proposes to release were obtained. AR 07-09, 15-16, 18-19, 20-24, and 33-34. P&W's affidavits also demonstrated that the photographs and other information obtained during the Engine Center Audit is information of a kind that P&W does not customarily make available to the public, and that the information was therefore exempt from disclosure under *Critical Mass. Id.*

DCMA's October 12, 2005 decision agreed that the photographs taken by DCMA auditors during the Engine Center audit and P&W's response to the CAR were voluntarily obtained and were exempt from disclosure under *Critical Mass* because they were information of a type that P&W did not customarily make available to the public. AR 118. However, DCMA disagreed that the information in the Engine Center audit report and the other unscheduled audit reports, the DCMA Briefing (including the captions to the photographs found to be exempt from disclosure), the CAR, and the related e-mails was voluntarily submitted. AR 117. DCMA asserted that this information was required to be submitted, and was therefore governed by

*National Parks,* because P&W "was required by the terms of its contracts with the Government to submit to Government review of its quality system." *Id.*

P&W requested DCMA to reconsider its decision that the information referenced above was required to be submitted. AR 233-34. P&W explained that its contracts required it to submit to Government review of its quality system *as provided for in its contracts*, and P&W's contracts generally incorporated by reference P&W's quality assurance system procedures, which provide for advance notification by DCMA of all impending quality audits. AR 32, 233. Consequently, while P&W was not required to submit to the unscheduled Engine Center audit, it did so voluntarily, and the information obtained during the audit was therefore voluntarily obtained from P&W. *Id.* P&W pointed out that DCMA itself recognized this when it found that the photographs taken during the audit to have been voluntarily obtained from P&W because the DCMA auditors had brought cameras into the Engine Center in a manner inconsistent with P&W's procedures. AR 231-32.[4]

In its November 21, 2005 response to P&W's request for reconsideration, DCMA stated that it disagreed with P&W's evidence that P&W's internal quality procedures require advance notification of an impending audit. AR 254. DCMA further asserted that it "did provide courtesy notification to Senior P&W management prior to each of the three audits." *Id.* DCMA identified three DCMA e-mails that notified various P&W personnel that "no notice audits" would be taking place. *Id.* However, the fact that e-mails refer to the audits as "no-notice" audits confirms P&W's evidence that the audits were unscheduled audits, *i.e.*, that they were

4 P&W also pointed out that there was no rational bases for distinguishing between the photographs, which DCMA-East found to be voluntarily obtained from P&W, and the captions to the photographs, which DCMA-East found were not voluntarily obtained from P&W even though the information contained in the photographs and captions is the same. AR 231-33.

performed in a manner inconsistent with P&W's procedures. Thus, DCMA's conclusion that the audits were consistent with P&W's procedures and the contracts is inconsistent with the evidence in the record and legally erroneous, and therefore is arbitrary and capricious and not otherwise in accordance with law.

Recognizing the self-contradictory nature of the evidence relied upon by DCMA, the Department of Justice has submitted the Declaration of Steven Bogusz and attached P&W's quality procedure and two other declarations that purport to provide supporting evidence for DCMA's argument that it gave the required notice. Def. Mem. at 8-10. However, these documents are not part of the Administrative Record, and therefore should not be considered by the Court in reviewing DCMA's decision to release. *See* P&W's Motion To Strike.

**CONCLUSION**

For the reasons stated above, the Court should grant P&W's cross-motion for summary judgment and deny Defendant's motion for summary judgment.

Respectfully submitted,

/s/ Robert K. Huffman

ROBERT K. HUFFMAN (D.C. BAR NO. 219915)
EMMETT B. LEWIS (D.C. BAR NO. 308627)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-5824
(202) 628-0858 facsimile
Attorneys for Plaintiff
United Technologies Corporation,

Pratt & Whitney Division

*Of Counsel*:

LESTER K. KATAHARA (D.C. BAR NO. 367691)
PRATT & WHITNEY MILITARY ENGINES
400 Main Street M/S182-30
East Hartford, CT 06108
(860) 565-5416
(860) 755-5878 (facsimile)

LEAH E. FRAZIER (D.C. BAR NO. 492540)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C.  20005-5701
(202) 626-6086
(202) 628-0858 facsimile

Dated:  April 24, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION,<br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE, et al.<br><br>Defendants. | Civil Action Number: 05-2271 (RWR) |

**PLAINTIFF'S COUNTERSTATEMENT OF FACTS**

In accordance with Local Civil Rule 56.1 of the United States District Court for the District of Columbia, Plaintiff United Technologies Corporation, Pratt & Whitney Division hereby respectfully submits its counter-statement of facts in response to Defendant's statement of material facts which are not in genuine dispute.

1. Defense Contract Management Agency (DCMA) is the Department of Defense (DoD) [c]omponent that works directly with Defense contractors to ensure that DoD, Federal, and allied government supplies and services are delivered on time, at projected cost, and meet all contractual performance requirements.

**Response:** Agreed.

2. DCMA East (DCMAE) is a component of the DCMA.

**Response:** Agreed.

<YiF>608088.1</YiF>

3. DCMAE maintains resident offices at the facilities of a number of large Defense contractors. One such resident office is located at United Technologies, Pratt & Whitney Division, in East Hartford, Connecticut (hereinafter "P&W").

**Response:** Agreed.

4. Plaintiff is a large defense contractor producing aircraft engines and spare parts for military and civilian aircraft.

**Response:** Agreed.

5. Plaintiff contracts with defendant Department of Defense to supply military aircraft engines, spare parts and associated services.

**Response:** Agreed.

6. Many of the contracts between plaintiff and defendant are for supplies at a fixed price. The contracts contain Federal Acquisition Regulation (FAR) Clause 52.246-2, Inspection of Supplies - Fixed Price, 48 C.F.R. § 52.246-2. Paragraph (b) of the clause requires the contractor to maintain an inspection system that is acceptable to the Government and gives the Government the right to perform reviews and evaluations necessary to ascertain compliance with the requirements of paragraph (b). Paragraph (b) states:

> (b) The Contractor shall provide and maintain an inspection system acceptable to the Government covering supplies under this contract and shall tender to the Government for acceptance only supplies that have been inspected in accordance with the inspection system and have been found by the Contractor to be in conformity with contract requirements. As part of the system, the Contractor shall prepare records evidencing all inspections made under the system and the outcome. These records shall be kept complete and made available to the Government during contact performance and for as long afterwards as the contract requires. The Government may perform reviews and evaluations as reasonably necessary to ascertain compliance with this paragraph. These reviews and evaluations shall be conducted in a manner that will not unduly delay the contract work. The right of review, whether exercised or not, does not relieve the Contractor of the obligations under this contract.

<YiF>608088.1</YiF>

**Response:**

Plaintiff agrees that many of its contracts with Defendant are for supplies at a fixed price and that those contracts contain FAR Clause 52.246-2. However, the extent of the rights and obligations created under that clause are legal rather than factual issues, and therefore require no response. FAR Clause 52.246-2 speaks for itself.

7. Pursuant to its contract authority, DCMA conducted audits of plaintiff's quality systems in July, September, and November 2004.

**Response:**

Agreed that DCMA conducted audits of P&W's quality systems during the months in question. Whether DCMA conducted these audits "pursuant to its contract authority" is a question of law, and therefore requires no response.

8. Prior to each audit, DCMA notified plaintiff of the pending audits. With respect to the July 2004 audit of P&W's Weld Wire procedures, the Commander of the DCMA Office located at P&W, Lieutenant Colonel (LTC) Pete Leahy, notified P&W Senior Vice President, Larry Moore, Quality Manager, Michael Pcholinski, and Vice President of Quality, Eileen Drake, of the upcoming audit in an email dated June 16, 2004. With regard to the September 2004 audit of P&W's Manufacturing Fixture Control Procedures, LTC Leahy notified Larry Moore of an upcoming audit in an email dated August 30, 2004. As to the November audit of P&W's Engine Center, Acting DCMA P&W Commander, Michael Klem, provided advance verbal notification on October 28, 2004, to P&W Quality Managers, Mark Allen and Michael Pcholinski.

**Response:**

Plaintiff disagrees, as the evidence upon which Defendant relies is outside the administrative record.

<YiF>608088.1</YiF>

9. On December 15, 2004, DCMAE received a FOIA request from the Hartford Courant seeking the following documents related to DCMA audits of the quality system at P&W:

a. A report on the findings of a DCMA audit at P&W Engine Center in Middletown, Connecticut, on November 8 through November 10, 2004.

b. The Level III Corrective Action Request directed to P&W following that audit.

c. Any other correspondence, reports, or documents connected with the audit.

**Response:**

Agreed.

10. Responsive documents totaling 352 pages and falling into the following six categories were identified: (1) a November 2004 Report of the Audit of P&W's Engine Center in Middletown, Connecticut and DCMA internal correspondence regarding the audit; (2) Reports of Audits conducted in July and September of 2004 of P&W's Weld Wire and Manufacturing Fixture Control processes; (3) Digital photographs taken by DCMA personnel during the performance of the November 2004 Engine Center Audit; (4) A November 2004 briefing prepared by DCMA to inform P&W management of the results of the Engine Center Audit; (5) Two December 8, 2004 Level III Corrective Action Request letters issued by DCMA to P&W senior management and DCMA email correspondence distributing the Corrective Action Requests to Government personnel; and (6) Correspondence from Pratt & Whitney to DCMA regarding the Engine Center Audit and the Level III Corrective Action Request letters.

**Response:**

Agreed.

11. On January 28, 2005, the DCMA Office of Counsel located in Hartford, Connecticut sent the documents to P&W for review pursuant to Executive Order 12600 and DoD FOIA

<YiF>608088.1</YiF>

Regulation 5400.7-R, C5.2.8. P&W was given 30 calendar days to present any objections concerning the release of the documents.

**Response:**

Agreed.

12. In February of 2005, P&W Office of Counsel verbally requested and was granted an extension to file its response until March 24, 2005.

**Response:**

Agreed.

13. P&W responded by letter dated March 24, 2005, contending that the information contained in the responsive documents was exempt from disclosure pursuant to FOIA Exemption 4, 5 U.S.C. § 552(b)(4).

**Response:**

Agreed.

14. By letter dated October 12, 2005, DCMA notified P&W of its decision to release to the Hartford Courant, on October 26, 2005, portions of the responsive documents and attached a set of documents incorporating all proposed redactions. In that letter, DCMA determined that the information contained in the reports of the November 2004 Engine Center Audit and related DCMA correspondence, the September 2004 Manufacturing Fixture Control Audit, and the July 2004 Weld Wire Audit, were not voluntarily provided to the Government by P&W but rather were required to be provided by the terms of P&W's contracts with the Government. DCMA concluded that release of the same information would not impair the Government's ability to obtain from P&W (or any other contractors) essential information about their quality systems in the future. DCMA further concluded that, with the exception of actual P&W quality system

<YiF>608088.1</YiF>

provisions which would be redacted, the release of the documents would not likely result in substantial competitive harm to P&W. With regard to the Level III Corrective Action Request (CAR) letters issued by DCMA on December 8, 2004 and related e-mail correspondence transmitting the CAR letters within the Government, DCMA determined that their release would neither result in impairment of the Government or substantial competitive harm to P&W.

**Response:**

Plaintiff agrees that DCMA notified it by letter on October 12, 2005 of its intention to release information to the Hartford Courant. That letter, which is part of the Administrative Record, speaks for itself. Plaintiff disagrees with the rationales and/or supporting evidence purported to be added to the October 12, 2005 decision by the Declaration of Steven Bogusz cited by Defendants as that Declaration and its attachments are outside of the Administrative Record.

15. In that same letter, DCMA agreed that two categories of responsive documents were exempt. The exempt categories were (1) the digital photographs taken by DCMA personnel during the performance of audits at P&W's manufacturing facility, and (2) P&W's written responses to DCMA's December 8, 2004, Corrective Action Requests.

**Response:**

Agreed.

16. DCMA also agreed with P&W that release of any portions of the documents that quoted or described in detail P&W's quality control or manufacturing processes or procedures would likely result in substantial competitive harm to P&W. For that reason, DCMAE redacted those portions of the documents.

<YiF>608088.1</YiF>

**Response:**

Agreed that DCMAE made the finding of likely substantial competitive harm referred to and that it purported to redact portions of the documents that quoted or described in detail P&W's quality control or manufacturing process or procedures.

17. On or about 19, 2005, P&W requested and was given an extension to file suit from October 26 to November 23, 2005.

**Response:**

Agreed.

18. By letter dated November 14, 2005, P&W, through Counsel Robert Huffman of Miller & Chevalier, requested reconsideration of the October 12, 2005 decision. The arguments made by P&W in support of its request for reconsideration were virtually the same arguments that P&W made in its submission of March 24, 2005. P&W asked DCMAE to make the following findings: (1) that the captions to the photographs in the DCMA Briefing to P&W were exempt from disclosure for the same reason that the photographs were determined by me to be exempt; (2) that the information in the Engine Center Audit Report and other Audit Reports, the Level III Corrective Action Request, and the related DMCA e-mails was voluntarily obtained from P&W and was therefore exempt from disclosure; (3) that release of the information contained in the Audit Reports, the Level III Corrective Action Request, and the related e-mails would impair DCMA's ability to obtain necessary information from P&W and other DoD contractors in the future and was therefore exempt from disclosure; and (4) that the information contained in the Audit Reports, the Level III Corrective Action Request, and the related e-mails was also exempt because its disclosure was likely to cause P&W substantial competitive harm.

<YiF>608088.1</YiF>

**<u>Response</u>:**

Plaintiff agrees that it requested reconsideration of the October 12, 2005 decision by letter dated November 14, 2005. Plaintiff's letter requesting reconsideration speaks for itself.

19. DCMA reviewed plaintiff's November 14, 2005 request for reconsideration and concluded that it did not provide any additional information to warrant a change to the decision of October 12, 2005, to release the specified documents as redacted.

**<u>Response</u>:**

Agreed.

20. By letter of November 21, 2005, DCMA responded to Counsel for plaintiff and reiterated the decision rendered in the letter of October 12, 2005 and informed P&W that [it] must file suit by November 23, 2005 to prevent the release of the records.

**<u>Response</u>:**

Agreed.

Respectfully submitted,

/s/ Robert K. Huffman

ROBERT K. HUFFMAN (D.C. BAR NO. 219915)
EMMETT B. LEWIS (D.C. BAR NO. 308627)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-5824
(202) 628-0858 facsimile

Attorneys for Plaintiff
United Technologies Corporation,
Pratt & Whitney Division

<YiF>608088.1</YiF>
<YiF>608088.1</YiF>

<u>*Of Counsel*</u>:

LESTER K. KATAHARA (D.C. BAR NO. 367691)
PRATT & WHITNEY MILITARY ENGINES
400 Main Street M/S182-30
East Hartford, CT 06108
(860) 565-5416
(860) 755-5878 (facsimile)

LEAH E. FRAZIER (D.C. BAR NO. 492540)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-6086
(202) 628-0858 facsimile

Dated: April 24, 2006

<YiF>608088.1</YiF>