# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**CANADIAN COMMERCIAL CORP., et al.,**

    **Plaintiffs,**

       **v.**

**DEPARTMENT OF THE AIR FORCE,**

    **Defendant.**

**Civil Action No.  04-1189 (JDB)**

## MEMORANDUM OPINION

Plaintiffs Canadian Commercial Corp. ("CCC") and Orenda Aerospace Corp. ("Orenda") (collectively "plaintiffs") filed this "reverse FOIA" action on July 14, 2004, seeking to enjoin defendant Department of the Air Force ("defendant" or "Air Force") from releasing to a competitor, Sabreliner Corporation ("Sabreliner"), certain financial data submitted by plaintiffs in connection with a bid for a contract to provide J85 turbojet engine repair and maintenance services.  Plaintiffs challenge defendant's administrative decision to release the information in response to Sabreliner's request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C).  Specifically, plaintiffs submit that the information sought by Sabreliner is exempt from disclosure under 5 U.S.C. § 552(b)(4) ("Exemption 4") and McDonnell Douglas v. Air Force, 375 F.3d 1182 (D.C. Cir. 2004) ("McDonnell Douglas"), and that it constitutes trade secrets under the Trade Secrets Act ("TSA"), 18 U.S.C. § 1905, the disclosure of which is not "authorized by law."  The parties have filed cross-motions for summary judgment.  For the

reasons that follow, the Court will grant plaintiffs' motion in part and deny it in part, and will

grand defendant's motion in part and deny it in part.

## **FACTUAL BACKGROUND**

On January 16, 2002, the Air Force issued a solicitation for the performance of

maintenance and repair work on J85 turbojet engines ("solicitation").  Admin. Rec. Exh. 15.

Plaintiff Orenda submitted a proposal through plaintiff CCC, in accordance with the Federal

Acquisition Regulations ("FAR").  Pl.'s Stmt. at 2 ¶ 2.  The solicitation stated that responders

were "requested" to submit certain pricing information, and that a failure to do so could result in

the proposal's disqualification.  See Admin. Rec. Exh. 28 at § 1.0.  By law, the government is

required to consider price when it decides which proposal to accept.  See Admin. Rec. Exh. 14 at

8 (citing FAR §§ 15.304(c)(1), 15.101).  Plaintiffs' proposal contained detailed pricing

information for the base year of the contract in addition to five subsequent option years.

Plaintiffs submitted a formal offer on March 4, 2002.  See Admin. Rec. Exh. 5 at 1.  At this time,

Sabreliner also submitted an offer in response to the solicitation, Pl.'s Stmt. at 2 ¶ 3, but the Air

Force awarded the contract to plaintiffs on May 7, 2002, see Admin. Rec. Exh. 15.

Although the contract is between CCC and the Air Force, CCC contracted its duties to

Orenda, such that Orenda performs the actual labor.  Pl.'s Stmt. at 2 n.1.  The contract has a base

term of three years and four option years, over which time plaintiffs agreed to repair, overhaul,

and modify J85 turbojet engines.  Admin. Rec. Exh. 15; Pl.'s Stmt. at 2-3 ¶ 4.  The contract

expressly incorporated the pricing information (for both the base term and the subsequent option

years) by reference to Orenda's original proposal.  Admin. Rec. Exh. 15.  Plaintiff Orenda began

performing under the terms of the contract, and continues to do so today (the contract expires in

2008).  Pl.'s Stmt. at 2 ¶ 5.

Sabreliner contested the contract award before the General Accountability Office ("GAO") and sought to gain access to plaintiffs' detailed pricing information.  Pl.'s Stmt. at 3 ¶ 6. During the bid protest, Sabreliner's attorneys were permitted to review the information, but Sabreliner itself was screened from it.  Id.  Ultimately, Sabreliner's protest of the contract award was unsuccessful.  Id.  On September 12, 2003, Sabreliner filed a FOIA request with the Air Force.  Admin. Rec. Exh. 1.  The FOIA request sought release of the contract and all orders and modifications to it.  Id.  The Air Force notified plaintiffs of Sabreliner's request, asking them to review all of the pricing information and stated subcontracting goals attached to the contract in order to determine whether Sabreliner's request sought protected trade secret, commercial, or financial information.  Admin. Rec. Exh. 2.  Plaintiffs were directed to identify any particular information that they sought to protect from disclosure, and to provide evidentiary support and detailed analysis to assist the Air Force in determining whether the information came within any FOIA exemptions.  Id.  In response, Orenda submitted three documents -- an opposition letter dated November 13, 2003, Admin. Rec. Exh. 7 at 2-12; a clarification letter dated December 3, 2003, Admin. Rec. Exh. 9 at 2-3; and a supplemental letter dated January 23, 2004, Admin. Rec. Exh. 9 at 8-11.  Together, Orenda submits that those filings proffered "several layers of clear and robust arguments against disclosing its information to [Sabreliner]."  Pl.'s Stmt. at 15 ¶ 30.

## I. Orenda's First Submission: Opposition Letter of November 13, 2003

In its initial opposition, Orenda sought to protect four categories of cost and pricing information from disclosure: (1) "[a]ll line-item price and price-related information under [the current contract]"; (2) "[a]ll line-item price and price-related information contained in every

option year Exhibit (Exhibits A to E)"; (3) "[a]ll Fixed Hourly Labor Rates for Over and Above Prices"; and (4) "[a]ll cost, price, and price-related information contained in Orenda's Subcontracting Plan." Pl.'s Stmt. at 9 ¶ 20. In order to provide guidance and clarity for the Air Force, Orenda appended redacted materials to its opposition letter, and stated that it found "no legal authorization for disclosure of such information . . . [which] is expressly prohibited by federal law." Pl.'s Stmt. at 9-10 ¶ 21. A redacted copy of the contract was also attached, in order to show the Air Force which pricing information was allegedly exempt. Id; see also Admin. Rec. Exh. 7. In a nutshell, Orenda claimed that the line-item unit and other pricing information was protected by the TSA, could be withheld from disclosure pursuant to Exemption 4 of FOIA, and was not authorized for release by FAR or any other provision of law. Admin. Rec. Exh. 7 at 2.

Orenda argued that although §§ 15.503 and 15.506 authorize the general disclosure of unit price information, both provisions protect that information if it is "confidential, trade secret, or otherwise exempt under Exemption 4 [of FOIA]." Id. According to Orenda, the information at issue qualifies as confidential, trade secret, and exempt under Exemption 4, which allows the government to withhold information in response to a FOIA request if it is "commercial or financial" and "privileged or confidential." Admin. Rec. Exh. 7 at 3. Orenda claimed that the information was privileged and confidential because it was submitted voluntarily -- defendant's solicitation did not require the information -- and Orenda continuously represented the sensitive and confidential nature of the information, informing the Air Force that only certain persons were authorized to review the information and including a confidentiality footer on the cover page of the submission. Pl.'s Stmt. at 15-16 ¶¶ 30-31; 5-6 ¶ 14. Because the information is of a type that

-4-

"would not customarily be released to the public by the person from whom it was obtained," see Pl.'s Stmt. at 15-16 ¶ 30, Orenda continued, Exemption 4 justified its nondisclosure.

In the alternative, Orenda argued that even if the submission was involuntary, the information would still be privileged and confidential because its release was likely to seriously impair the Air Force's ability to obtain necessary information in the future. Pl.'s Stmt. at 6 ¶ 15. Specifically, disclosing this type of information would allegedly deter competitors from bidding on future solicitations, which would compromise the quality of goods and services performed -- as well as the integrity and fairness of the bidding process -- by undermining the government's "fundamental policy of open competition." Pl.'s Stmt. at 6-7 ¶¶ 16-17; 15-17 ¶¶ 29, 31-33. Additionally, Orenda anticipated that its competitive advantage would be substantially undermined by the release of the information because Sabreliner -- and other companies with whom Orenda competes on the open market -- would be able to reverse-engineer Orenda's pricing formulae, ascertain its pricing strategy, "raid its subcontractor portfolio," and undercut its future bids. Pl.'s Stmt. at 7-8 ¶ 18; 15-17 ¶¶ 31-33. Because the TSA protects proprietary information that comes within the ambit of Exemption 4, Orenda further asserted that the Air Force was actually prohibited by law from disclosing this information to Sabreliner. Pl.'s Stmt. at 9 ¶ 19.

## II. Orenda's Second Submission: Clarification Letter of December 3, 2003[1]

The Air Force then asked Orenda on November 24, 2003 to clarify the scope and application of its objections. Within two weeks, Orenda submitted the December 3, 2003

---

[1]It is unclear exactly when this submission was made. The clarification letter itself is dated December 3, 2003, but it appears that the cover letter is dated December 4, 2003.

"opposition clarification" letter.  Admin. Rec. Exh. 8.  This time, Orenda described the material it sought to protect as "commercially sensitive information," Pl.'s Stmt. at 10 ¶ 22, which

> specifically means all cost and pricing figures, including, but not limited to, all current and projected line-item prices, all fixed hourly labor rates for its over and above prices, all pricing and price-related information contained in its subcontracting plan, and all other information contained in any relevant document that could be used to derive this cost and pricing information.

Admin. Rec. Exh. 9 at 1-2.  Orenda concluded by referring the Air Force to the redacted versions of Exhibits A - E, and including redacted versions of the contract modifications that contained commercially sensitive material.  Id.

### III.  Orenda's Third Submission: Supplement of January 23, 2004

On January 23, 2004, Orenda sent a third letter to further supplement the initial opposition and subsequent clarification.  See Pl.'s Stmt. at 11 ¶ 24; Admin. Rec. Exh. 9, Orenda Opp'n Suppl., at 1-2.  The supplement focused on Orenda's previous contentions that the release of the pricing information would cause substantial competitive harm, would damage the Air Force's future efforts, and would endanger the integrity of the procurement system.  See Pl.'s Stmt. at 11 ¶ 24; Admin. Rec. Exh. 9, Orenda Opp'n Suppl., at 1-2.  A memorandum from John Bayley, Orenda's Director of Operations, was appended to this supplemental submission ("Bayley Memorandum").  Pl.'s Stmt. at 11 ¶ 25; Admin. Rec. Exh. 9, Orenda Opp'n Suppl., at 1-2.  The purpose of the Bayley Memorandum was to explain and detail, by way of example, the process through which Sabreliner, with knowledge of the information that is the subject of the FOIA request, might reverse-engineer Orenda's costs and prices.  Pl.'s Stmt. at 11 ¶ 25; Admin. Rec. Exh. 9, Orenda Opp'n Suppl., at 2.

-6-

Specifically, the Bayley Memorandum claimed that once Sabreliner received the information at issue, it could calculate three key components of Orenda's confidential pricing strategy -- its fully-burdened labor rate, its material mark-up, and its pricing for J85 engine repair services (which, according to Orenda, is unique in the industry).  Pl.'s Stmt. at 11 -14 ¶¶ 25-27; Admin. Rec. Exh. 9, Orenda Opp'n Suppl., at 1-3.  The Bayley Memorandum asserted that the slightest disclosure of its pricing and cost information would enable Sabreliner (and possibly other companies with whom Orenda competes for contracts on the open market) to wreak devastation upon its competitive position with respect to both current and future contracts.  Pl.'s Stmt. at 14-15 ¶ 28; Admin. Rec. Exh. 9, Orenda Opp'n Suppl., at 3-4.

The supplemental submission also noted that Mr. Paul D. Ford, the former Chief of the Tactical/Trainer/Specialty Engine Branch OC-ALC/LPEA for the Air Force, had retired and joined a subsidiary of Sabreliner.  Pl.'s Stmt. at 15 ¶ 29; Admin. Rec. Exh. 9, Orenda Opp'n Suppl., at 3-4.  Orenda informed the Air Force that in his current capacity, Mr. Ford was responsible for the direct oversight of J85 program managers and that he also acted as an advisor to the source-selection team with respect to the very contract that the Air Force awarded to Orenda.  Pl.'s Stmt. at 15 ¶ 29; Admin. Rec. Exh. 9, Orenda Opp'n Suppl., at 3-4.  Orenda also represented that Mr. Ford had probably seen its pricing information while in the government, and opined that, based upon Mr. Ford's understanding of the dynamics of the industry, any further exposure to its cost and pricing information would enable him to deduce Orenda's labor costs, material charges, and key pricing strategies.  Pl.'s Stmt. at 15 ¶ 29; Admin. Rec. Exh. 9, Orenda Opp'n Suppl., at 3-4.

IV. __The First Air Force Decision Letter__

On July 1, 2004, the Air Force informed plaintiffs that it intended to release the requested information to Sabreliner.  Admin. Rec. Exh. 10 at ¶ 1.  The four-page decision letter first stated, without any analysis or rationale, that Orenda was required to submit the information with its proposal.  Id. at ¶ 2.  The information was, in the Air Force's view, therefore subject to the more stringent test for involuntarily-submitted information, which requires that disclosure of the information be shown to pose a likelihood of either: (1) impairment to the government's ability to obtain necessary information in the future, or (2) substantial harm to Orenda's competitive position. Id.  As to the first possibility, the Air Force dismissed plaintiffs' arguments solely by relying upon its "experience in government contracting" -- no analysis was provided, and defendant never described that expertise.  Id.

On the likelihood of substantial competitive harm aspect, the Air Force stated that to "undercut" or "ratchet down" Orenda's prices effectively, competing firms would have to "predict Orenda's proposed price on future transactions with some degree of precision."  Id. at ¶ 2(a).  The Air Force again relied upon its "experience in government contracting," stating that this experience led it to believe that past and present prices are imprecise predictors of future prices because variables like "economic uncertainty, changes in technology, work requirement, productivity and bargaining power all frustrate attempts to accurately predict prices over time." Id.  Hence, in the Air Force's view, "the likelihood of competitive harm due to undercutting or ratcheting down is not substantial." Id. (emphasis added).  Moreover, the Air Force claimed that even if some undercutting or ratcheting-down were to occur, the harms would be mitigated

because "price is just one of many factors considered." Id.  Orenda's fear that a competitor could

submit an unsolicited proposal in an attempt to persuade the government not to exercise the

option year provisions was unfounded, the Air Force continued, for two reasons: (1) FAR §§

2.101 and 15.6 place certain restrictions on the submission of "'new and innovative' idea[s]" to

the government; and (2) FAR §§ 17.207(d) and (e) do not permit the government to rely on price

alone when "other factors," including the government's need to continue operations and the

significant transaction costs associated with disrupting engine repair operations, are to be

considered.  Id.

    With respect to Orenda's argument that competitors could "reverse-engineer" cost and

pricing strategies, and thereby "peer into its financial structure," id. at ¶ 2(b), the Air Force

concluded that the examples in the Bayley Memorandum did not adequately illustrate how this

could be done.  To begin with, the example regarding calculation of Orenda's fully-burdened

labor rate was "presumptive," in the Air Force's view, because it assumed that the number of

hours required to perform the work was a known variable.  Id. at ¶ (2)(b)(1).  In the Air Force's

words,

> [t]wo separate repair contractors may use different approaches to arrive at significantly
> different hours to repair [the same] item.  A multitude of factors, such as risk assessment,
> production capacity, repair methods, skill mix and level of employee experience, to name
> a few, could result in significant differences in the number of hours.  Even for this
> 'simple' case that uses small numbers, a scant one half hour increase in the number of
> hours estimated to repair [the item], even when a unit price of the repair is known, results
> in the fully burdened labor rate being more than eight dollars . . . lower.

Id.  Hence, the Air Force concluded that Orenda's example actually illustrated that "a competitor

using the 'divined' burdened labor rate would be unlikely to harm the competitive position of

Orenda, potentially resulting in just the opposite," and noted that the potential for difference

would be even larger when other factors, including type and sophistication of the equipment involved, were properly introduced into the assessment. <u>Id</u>. Moreover, the Air Force continued, the potential for uncertainty is exacerbated when one takes account of the fact that one contractor might determine that an item simply needs to be repaired, while another might decide that it needs to be overhauled, requiring more labor and material input. <u>Id</u>. Hence, the Air Force concluded that it "would be virtually impossible for a competing contractor to ascertain the number of hours for the more complex, high volume [items] on this contract. The likelihood of competitive harm to Orenda is [therefore] not substantial." <u>Id</u>.

The Air Force found that a second example selected from the Bayley Memorandum (focusing on the ability of a competitor to calculate Orenda's material mark-up) suffered from the same types of deficiencies: it assumed that the number of hours and the fully-burdened labor rate were a known and reliable figures; it "fail[ed] to address other variables, such as quantity discounts and bargaining power;" and it ignored the more complex [items] requiring more complex and costly material." <u>Id</u>. at ¶ 2 (b)(2). According to the Air Force, Orenda also "provid[ed] no discussion or example of how a competitor could ascertain sensitive cost or pricing information, such as G[eneral] & A[dministrative expense] or profit rates from the unit prices." <u>Id</u>. at ¶ 2(b)(3). The discussion closed with a repetition of the previously-stated conclusion that "the likelihood of competitive harm is not substantial" because: (1) "[t]here are simply too many unascertainable variables to allow competitors to predict Orenda's future pricing and strategies based on release of these unit prices;" and (2) "the effect of undercutting or ratcheting down would be diluted" as a result of the fact that "price is just one of many factors considered." <u>Id</u>. at ¶ 2(b)(4).

Finally, the Air Force dismissed Orenda's argument regarding its unique pricing strategy on the basis that "Orenda has not shown [its] approach is unique . . . nor can [it] show any evidence or example to support [the] claim . . . that 'this is not the pricing structure employed by our competitors in J85 engine and maintenance work.'" Id. at ¶ 2(c). Moreover, the Air Force asserted that Orenda "has not shown a competitor could deduce . . . Orenda's approach by simply reviewing Orenda's unit prices . . . [the] argument is speculative and inadequately supports [the alleged] conclusion." Id. Defendant also disposed of Orenda's fears regarding Mr. Ford, stating that, notwithstanding Orenda's contentions, there was "no reason to believe this employee accessed Orenda's sensitive cost and pricing information. Even if he did, release of these contract unit prices would not broaden the scope of his understanding of Orenda's sensitive cost and pricing information." Id. at ¶ 2(d).

## V. **This Action**

Plaintiffs filed this reverse-FOIA action following their receipt of the Air Force's first decision letter. Shortly thereafter, McDonnell Douglas, 375 F.3d 1182 (D.C. Cir. 2004), was decided by the D.C. Circuit; it is a reverse-FOIA case with similar facts, in which the Air Force relied on many of the same arguments that it employs here. The government sought rehearing en banc in that case, and the parties in this case considered the outcome of McDonnell Douglas to be "influential," Joint Mot. Amend Sched. Order, dkt. no. 16, at 1, or even "pivotal," Joint Mot. Stay, dkt. no. 17, at 1. The Air Force represented that based on the outcome in McDonnell Douglas, it might reconsider its July 1, 2004 decision to release the disputed information to Sabreliner. Joint Mot. Amend Sched. Order, dkt. no. 16, at 1. Accordingly, the parties jointly moved this court for a stay pending a decision from the D.C. Circuit regarding whether

-11-

McDonnell Douglas would be reheard en banc.  See Joint Mot. Stay, dkt. no. 17, at 1-2.  The Court granted the parties' request.  See Minute Order (Oct. 14, 2004); see also Minute Entry (Sep. 13, 2004); Minute Order (Dec. 14, 2004).  Ultimately, the case was stayed through June 2005 to allow the government to determine whether to seek certiorari from the Supreme Court.  See Minute Order (Apr. 19, 2005); see also Def.'s Status Report, dkt. no. 18 (Mar. 31, 2005).  The Court set a briefing schedule on June 24, 2005, see Sched. Order, dkt. no. 20,  (Jun. 24, 2005), following which the Air Force sought and was granted several extensions of the deadline to file the Administrative Record, which was finally filed on July 25, 2005.  Briefing on summary judgment followed thereafter.

## VI.  The Second Air Force Decision Letter

On July 19, 2005, just before filing the Administrative Record, the Air Force issued a second decision letter that contained a much more detailed analysis than the first.  See Admin. Rec. Exh. 14.   The conclusion, however, was unaltered.  The Administrative Record included this second decision letter, as well as a new written submission made by plaintiffs (at the Air Force's request) before the second decision letter was issued.  See Admin. Rec. Exhs. 13, 14.

The second decision letter opens with a lengthy (though rambling) discussion of the history of government contracting and the passage of FOIA, through which the Air Force claims to establish that because contract prices "were releasable prior to enactment of FOIA," and "FOIA's enactment did not change the release requirement for contract prices," such information falls "outside the scope of FOIA exemption (b)(4)."  Id. at 2-4.  The Air Force then discusses the scope of the TSA and how it relates to contract award prices, arguing that the plain language of the TSA does not encompass contract prices.  Without relying on any authority from the FOIA

context, the Air Force sets forth a two-pronged legal calculus for the TSA under which it must

consider "1) whether the information falls within the plain terms of any category listed in the

TSA prohibition as understood by ordinary people and 2) if so, whether disclosure of the

information is otherwise authorized by law." Id. at 4. Before this standard is applied to the

information at issue, however, the decision letter embarks on a review of Supreme Court

precedent that examines the TSA in light of its character as a criminal statute. See id. at 4-5.[2]

　According to the Air Force, "'ordinary people' would not find the 'plain terms' of any

category of information identified in the TSA to include [plaintiffs'] sales prices or government

contract prices." Id. at 5. The Air Force quotes from the legislative history of FOIA, detailing a

congressman's difficulty in obtaining information about the contract prices of unsuccessful

competitors:  "[t]he Committee believes the trade secrets statute . . . neither applies to [this]

information . . . nor justifies a general rule against releasing all information submitted by

unsuccessful offerors on negotiated procurement."  H.R. Rep. No. 87-818, at 43  (1961).  Based

on this language, the Air Force concludes that "[l]ogic dictates that contract award prices of the

successful offeror must be outside the scope of the TSA" and that "contract award prices do not

fall within any category of information listed in TSA."  Id.

The next step in the Air Force's analysis considers whether disclosure of the information

is authorized by law, which would strip away any protection that the TSA might arguably

otherwise provide.  The Air Force quotes from four FAR provisions that it contends authorize the

―――――――――――――――――

[2]The reason for this discussion is presumably to provide the source of the two-part test that the
Air Force has conclusorily identified on page 4 of the decision letter.  See id. (quoting
extensively from Pierce v. United States, 314 U.S. 306, 311-12 (1941), and Kolender v. Lawson,
461 U.S. 352, 357 (1983)).

disclosure of contract unit prices, stating that

> FAR § 15.503(b)(iv) requires as specific government-wide procurement policy that all contract award unit prices "shall" be made publicly available upon request.  FAR §§ 15.503(B)(1)(iv) and 15.506(d)(2) require as specific government-wide procurement policy that competitors "shall" be provided all contract award unit prices.  FAR § 5.303(b)(2) requires as specific government-wide procurement policy that, if an agency elects to make local announcement to the media at award, contract award unit prices "shall" be included in such local public announcement of a negotiated procurement.  FAR § 3.104-2(b)(4) makes clear that OFPP took TSA into account when OFPP promulgated these mandatory requirements to disclose contract award unit prices.

Id. at 6.  The Air Force concludes this discussion with a statement that because the FAR provisions meet the test set forth in Chrysler Corp. v. Brown, 441 U.S. 281 (1979), they have the force and effect of law and, accordingly, the disclosure of the information at issue is "authorized by law" under the TSA by virtue of these FAR provisions.  Id.  Because "'. . . Congress did not design the FOIA exemptions to be mandatory bars to disclosure,'" id. at 6-7 (quoting Chrysler Corp.), FOIA does not provide any right to enjoin disclosure of information by an agency, id. at 7, the Air Force continues.  Although the APA provides such a right, the right is "limited" in the Air Force's view, from which it allegedly follows that "[t]he commercial information at issue must fall within the scope of both 1) the TSA and 2) FOIA exemption (b)(4).  Agencies are only required to withhold information meeting both requirements.  Contract Award prices meet neither of these two requirements."  Id.  No further analysis or citations are provided by the Air Force in support of this argument.

The remainder of the decision letter primarily addresses the arguments advanced by plaintiffs in their written submissions, as well as the Bayley Memorandum.  See id. at 7-25. Here, the Air Force summarily dismisses plaintiffs' argument that FAR does not authorize

disclosure of the information based upon the fact that the case plaintiffs rely upon, <u>MCI Worldcom, Inc. v. GSA</u>, 163 F. Supp. 2d 28 (D.D.C. 2001), did not involve the "brief[ing] or argu[ing]" of the legislative history that the Air Force includes in earlier sections of the decision letter. <u>Id</u>. at 7. The Air Force also reiterates its earlier conclusion that "release of contract award prices predates FOIA and FOIA's enactment did not operate to change prior law. . . . Rather, the legislative history shows that FOIA was enacted with knowledge of the prior law and practice of releasing contract award prices." <u>Id</u>.

Next, the Air Force concludes that the information was provided involuntarily because the contract at issue "is a requirements contract, which means that the government would be billed under the contract using delivery orders that vary in amount depending on the type and amount of work to be done . . . , [and r]eview of unit prices under the contract is essential in evaluating the proposals for this contract," and because FAR § 15.101 requires the government to consider price when "determining which offer constitutes the best value." <u>Id</u>. at 8. Hence, the Air Force analyzes whether the information is "privileged or confidential" within the meaning of Exemption 4 by using the <u>Nat'l Parks I</u> standard for information that has been involuntarily provided. <u>Id</u>. Here, plaintiffs had argued that impairment of the government's ability to obtain information in the future counseled against disclosure. But the Air Force asserts that the government, not plaintiffs, is in the best position to determine whether its interests would be harmed in this manner, and finds that it was unlikely that such impairment would result because "[p]rocurement regulations have required the disclosure of contract award unit prices to competitors since the late 1950s" and it has observed no "impaired competition in negotiated procurements in the over 45 years" since that time, nor does it have any reason to "forecast such

harm in the future." Id.

The Air Force then considers the likelihood of substantial competitive harm to plaintiffs, purportedly under Nat'l Parks & Conserv'n Ass'n v. Kleppe ("Nat'l Parks II"), 547 F.2d 673, 679-83 (D.C. Cir. 1983), Public Citizen Health Research Group v. FDA, 704 F.2d 1280 n.30 (D.C. Cir. 1983), and CNA Fin. Corp. v. Donovan, 830 F.2d 1132, 1152 & n.158 (D.C. CIr. 1987). See id. at 9-15. According to the Air Force's interpretation of Nat'l Parks II, the relevant two-part test for substantial competitive harm places the burden of proof on the party opposing disclosure. To adequately carry its burden, plaintiffs would need to produce "'specific factual and evidentiary material' . . . [to] demonstrate how the information can be affirmatively used by competitors to cause the substantial harm alleged." Id. at 10. Defendant characterizes "substantial" harm as a "demanding standard" based upon its interpretation of Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002). Id.[3]

The Air Force then proceeds to deconstruct ¶¶ 6-9 of the Bayley Memorandum. See id. at 10-15. According to the Air Force, plaintiffs failed to provide evidence that the government has ever chosen not to exercise an option in any of plaintiffs' prior contracts, or that there is a general practice of not exercising such options in "this type of contracting activity." See id. at 10-11. Options are, the Air Force asserts, "regularly and routinely" exercised "unless funds are not available to fund the requirement or the incumbent's performance was less than satisfactory. The latter circumstance would be undertaken only when that course would be more advantageous

---

[3]The Air Force acknowledges that Toyota Motor Mfg. addressed a different standard, but states (without any identifiable legal support) that "the requirement is equally applicable to FOIA since the Supreme Court has found that FOIA is 'exclusively a disclosure statute' and that its twin purposes are 'to check against corruption and to hold the governors accountable to the governed.'" See Admin. Rec. Exh. 14 at 10 (no citations provided for quoted language).

-16-

than termination for either convenience or default." Id. at 11.  In essence, market conditions

would have to be "so favorable that they would outweigh the need for continuity of operations,

potential costs of disrupting operations, and the risk that recompetition would not be overall

advantageous to the government." Id.  Relying on past practice, the Air Force concludes that it is

likely that options will continue to be regularly exercised due to "1) the likelihood that the

original competition resulted in all offerors offering their best prices at the time of contract award

and 2) the uncertain benefit of re-competition." Id.  Hence, the Air Force asserts that plaintiffs

did not carry their burden to establish that competitors could persuade the government not to

exercise the options and instead to recompete the contract.  Furthermore, any such unsolicited

proposal "based on price alone . . . does not meet the definition of 'unsolicited proposal' in FAR

2.101 Subpart 15.6. . . . [and] could not be considered by the government." Id.

Addressing plaintiffs' argument that disclosure would permit competitors to undercut

prices in the future, the Air Force concluded that because the option year pricing information

essentially forecasts what the prices will be based upon a multitude of factors (including then-

current costs and cost estimates) that existed in 2002 (when the forecasts were made), it is

unlikely that competitors would be able to calculate what the prices would actually be some three

to seven years later, when those factors and considerations may be markedly different. See id. at

11.  To the Air Force, plaintiffs had not demonstrated how, in light of the complexity and

precision required for such calculations, it was likely that competitors could "accurately duplicate

the myriad of considerations and factors . . . used to calculate any of [the] option year prices for

any line item, or know how well the models . . . used to calculate . . . [them] tracked actual

economic conditions to any particular point in time in the future." Id. at 12.  The prices that

plaintiffs would actually offer in the future would, in the Air Force's view, be based on their actual costs at that time and projections of "changes in costs and economic and market circumstances over the period of the anticipated contract . . . [as well as] current micro-economic circumstances and . . . business circumstances and goals (including risk assessment and profit needs) at that time." Id. at 12.

The Air Force similarly dispensed with plaintiffs' "reverse-engineering" argument, finding that "line item prices established in 2002 cannot be dismantled by a competitor to determine each of the components that go into setting each of those prices. The components of the unit prices contain information that is known only to [plaintiffs]." Id. By the same logic, the Air Force continued, competitors would be unable to take the prices for the contract term, which were developed in 2002, and use them alone or in combination with option year prices to estimate the price of an item that would be provided at some unidentified future point. Id. "The actual costs at any point in the future," the Air Force opines, "will almost invariably vary from your projections because of the myriad of variables that impact any particular price computation over time." Id. Relying once again on its experience, the Air Force further states that the

> government has not been able to predict prices for any of the requirements specified in any of the line items or for items similar to those covered by these line items with any degree of accuracy. Nor has the government been able to discern the final negotiated prices in most current negotiations based on procurement history and market research. . . . despite the many pricing specialists hired to assist contracting officers in the acquisition process.

Id. at 13. From its discussion of plaintiffs' argument that disclosure would permit competitors to undercut or undermine other contracts with commercial partners, it is evident that the Air Force did not fully comprehend the points advanced in the Bayley Memorandum and written

submissions.  See id. at 13-15.  As a consequence, the discussion simply articulates points of

confusion -- specifically with respect to who or what constitutes a "commercial partner" -- and

concludes that the confusion results from plaintiffs' failure to carry its evidentiary burden.  See

id.  The Air Force also reiterates arguments made in the first decision letter with respect to the

likelihood that disclosure would reveal plaintiffs' pricing strategy, permit competitors to calculate

material markups or fully burdened labor rates, or threaten the integrity of the contracting system.

Specifically, the Air Force repeats that the examples contained in the Bayley Memorandum are

insufficiently complex, too speculative or conjectural, and improperly assume that the

requirements of all customers -- and the assessments of all competing firms -- would be the

same.  See id. at 17-22.

     As for the harm that plaintiffs allege will befall the Air Force and the integrity of the

contracting system, the Air Force claims that because such harms concern its own interests, it --

not plaintiffs -- can best judge whether such harms exist, and in its experience they do not.  See

id. at 17-21.  The Air Force asserts that companies often make use of several different pricing

strategies at different times, and  plaintiffs had failed to provide evidence of how competitors

could possibly ascertain which pricing strategy was being used in connection with a given

product or service at a particular time.  Furthermore, the Air Force claims that, based upon the

detailed requirements of the solicitation with respect to pricing, it would have been impossible

for plaintiffs actually to employ the "modular" strategy that they identified.  See id. at 22.

     Of the twenty-six repetitious pages in the second decision letter, only three and a half

even purport to address McDonnell Douglas.  Primarily, the Air Force interprets that case as

holding that

exemption (b)(4) establishes only the boundary of commercial information that the government is not required to disclose under FOIA, but . . . the government is only required to withhold such commercial information if it also falls within the TSA prohibition . . . . The scope of exemption (b)(4) falls totally within the scope of TSA, which means that [plaintiffs] must demonstrate that these contract prices fall within 'plain terms' of a TSA category as understood by 'ordinary people' in order for those prices to fall within exemption (b)(4).

Id. at 15.  The Air Force also relies on McDonnell Douglas to conclude (correctly) that "[w]hether any of the contract prices at issue must be withheld turns on the particular facts of this case," id. at 23, but spends the majority of its discussion attempting to draw very fine distinctions between McDonnell Douglas and this case (apparently attempting to limit McDonnell Douglas to its precise set of facts).  See id. at 23-24.  For example, the Air Force claims that McDonnell Douglas is distinguishable because those plaintiffs did not attempt to prevent the Air Force from releasing all of the pricing information -- they only sought to preclude the release of some of the information.  Id. at 23.  Moreover, according to the Air Force, the level of detail used to describe the alleged harms and to link harms to specific types of information was greater in McDonnell Douglas.  Id.  The Air Force then rejected plaintiffs' interpretation of McDonnell Douglas, characterizing it as an attempt to establish a per se rule against disclosure of pricing information in all circumstances -- which McDonnell Douglas itself rejects.  Id. at 24, 25.  In the Air Force's view, "the McDonnell Douglas holding dealing with unexercised option year prices [cannot be used] as a rule of general applicability" and the evidentiary support for each argument raised by plaintiffs must instead be analyzed "in accordance with the criteria set forth in Nat'l Parks II, Public Citizen, and Toyota."  Id. at 24.  The Air Force also appears to assert that McDonnell Douglas was incorrectly decided because the D.C. Circuit did not consider the legislative history of Exemption 4 or the mandates of the allegedly relevant FAR provisions, even going so far as to

suggest that the court misunderstood the requirements that apply in the context of negotiated solicitations.  See id. at 24-25.

## ANALYSIS

### I.    Which Decision Letter Constitutes the Administrative Decision Under Review?

A court "should have before it neither more nor less information than did the agency when it made its decision."  IMS, P.C. v. Alvarez, 129 F.3d 618, 623 (D.C. Cir. 1997) (citing Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984)).  "Because the court's review is confined to the administrative record at the time of the agency's decision, it may not include 'some new record made initially in the reviewing court.'"  Fund for Animals v. Williams, 31 F. Supp. 2d 191, 196 (D.D.C. 2005) (quoting Center for Auto Safety v. Fed. Highway Admin., 956 F.2d 309, 314 (D.C. Cir. 1992)).  Here, there is an important threshold question regarding what constitutes the Air Force's decision -- the first decision letter, which prompted plaintiffs to file this action, or the second decision letter, which the Air Force issued after this action was filed, during the time that it was stayed.  Generally, "[courts] do not rely upon counsel's post hoc rationale for upholding an agency's action."  McDonnell Douglas, 375 F.3d at 1188 (citing Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 626-27 (1986); Yukon-Kuskokwim Health Corp. v. NLRB, 234 F.2d 714, 718 (D.C. Cir. 2000)).

Although this issue usually arises in the context of counsel's attempt to justify a less-than-adequate agency decision, it applies with equal force to additional agency action following a decision because a post hoc rationalization is simply defined as one that "seek[s] to defend past agency action against attack."  See Auer v. Robins, 519 U.S. 452, 462 (1997); see also Maritel,

Inc. v. Collins, 422 F. Supp. 2d 188, 200 n.9 (D.D.C. 2006). Here, the parties disagree over the

significance and lawfulness of the post-McDonnell Douglas decision letter. Plaintiffs refuse to

recognize the second decision letter as the contested agency action, instead asserting that the

complaint filed in this Court challenges the first decision letter as arbitrary and capricious, and

the second decision letter amounts to nothing more than a post hoc rationalization which, under

McDonnell Douglas and other long-standing, well-established precedent, the Court may not

consider. See, e.g., Pl.'s Mem. Supp. at 14 n.6; Pl.'s Reply at 8 n.3; Pl.'s Reply at 12, 13, 15. In

plaintiffs' view, the Court never remanded this case for the Air Force to reconsider its first

decision letter. The Air Force, however, claims that when the Court issued a stay of proceedings,

it "remanded" the case to the Air Force for reconsideration of the earlier decision in light of

McDonnell Douglas.

　　　　The second decision letter in this case could exemplify the type of agency action that is

usually characterized as a post hoc rationale. To begin with, it reads like a litigation brief --

indeed, even a cursory comparison of the second decision letter and the Air Force's opposition

memorandum suggests that the former was the first draft of the latter. Moreover, the second

decision letter clearly seeks to defend, and cure any inadequacies in, the first decision letter.[4] See

Collagenex Pharms., Inc. v. Thompson, 2005 WL 256561, at *2 (D.D.C. Jan. 19, 2005)

(unpublished disposition) (characterizing the FDA's subsequent decision letter, which purported

to reconsider the first decision letter pursuant to plaintiff's request, as post hoc "support [for] the

agency's decision in this lawsuit"). Finally, the transcript of the Status Conference at which the

---

[4]Despite the Air Force's claim that the case was remanded to permit it to reconsider its earlier
conclusion in light of McDonnell Douglas, most of the second decision letter does not relate to
McDonnell Douglas.

Court granted the stay, and the Court's own recollection of the proceedings in this case, confirm

that this case was never actually remanded to the Air Force.  The proceedings were, in fact,

stayed at the parties' request, but only based upon the representation that a stay would enable the

parties to determine whether the case would go forward in light of the decision in McDonnell

Douglas, and would enable the Air Force to decide whether it would continue to pursue its

remaining rights of appeal.

But the issue is not quite so simple.  Following the stay of proceedings, plaintiffs

submitted a written document, albeit at the Air Force's invitation, in advance of the second

decision letter.   Specifically, on July 8, 2005, plaintiffs tendered a "Supplemental Submission"

(which they were "pleased" to make) that outlined substantive arguments against disclosure and

stated that plaintiffs "look[ed] forward to resolution of th[e] issue."  Admin. Rec. Exh. 13 at 1, 3.

Indeed, plaintiffs have acknowledged that the Supplemental Submission was intended to help the

Air Force appreciate the impact of McDonnell Douglas upon its earlier determination.  It is clear,

then, that plaintiffs sought to have the earlier determination reversed and expected to hear from

the Air Force in that regard, and are now simply dissatisfied with the Air Force's decision.

Having acquiesced in the reconsideration of the earlier decision, plaintiffs cannot now claim that

such reconsideration was improper.  Accordingly, the Court will review the post-McDonnell

Douglas decision letter under the APA.

The question that remains is whether the Court is armed with an adequate record upon

which to engage in a reasoned, detailed analysis of the pertinent agency decision.  In their

opening brief, plaintiffs chose to focus only on the arguments in the first decision letter.

Naturally, the Air Force's opposition memorandum largely relied upon the better-articulated

rationale supplied by the second decision letter. Plaintiffs' reply, however, did address the arguments raised in the Air Force's opposition memorandum, which mirrors the second agency decision letter. Moreover, the Court has subsequently given plaintiffs two additional opportunities -- through oral argument at the motions hearing, and through additional briefing ordered thereafter -- to focus on the sufficiency of the Air Force's rationale as expressed in the second decision letter. Hence, the record is adequate to enable the Court to assess the relevant agency decision.

## II.    Is the Material at Issue Exempt Under Exemption 4 of FOIA?

Exemption 4 permits the government to withhold information responsive to a FOIA request if the information is: (1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential. National Parks & Conserv. Ass'n v. Morton, 498 F.2d 765, 766 (D.C. Cir. 1974) ("Nat'l Parks I"); see also Critical Mass Energy Project v. NRC, 975 F.2d 871 (D.C. Cir. 1992). Here, only the third prong of the Nat'l Parks I test is contested. If the information was submitted to the government voluntarily, then in this reverse-FOIA context plaintiffs need only show that it is the type of information that they "would customarily not . . . release[] to the public." Critical Mass, 975 F.2d at 879. If, however, the information was submitted involuntarily, then it is only considered "privileged or confidential" if it is likely to either (1) impair the government's ability to obtain necessary information in the future, or (2) cause substantial harm to the plaintiffs' competitive position. Nat'l Parks I, 498 F.2d at 770; Critical Mass, 975 F.2d at 878.

The federal government is required by law to consider price when it decides which competitor should be awarded a contract. FAR § 15.304(c)(1); see also FAR §§ 15.101, 15.101-

1, 15.101-2.  This type of information is most often deemed a required element of government

solicitations, and hence involuntarily submitted.  See, e.g., Martin Marietta Corp. v. Dalton, 974

F. Supp. 37, 39 (D.D.C. 1997); McDonnell Douglas Corp. v. NASA, 895 F. Supp. 319, 325-26

(D.D.C. 1995), vacated on other grounds as moot, 88 F.3d 1278 (D.C. Cir. Apr. 1, 1996)

(unpublished disposition); cf. McDonnell Douglas, 375 F.3d at 1187 (noting that it was

"undisputed" that the plaintiff was required to provide this type of information to the Air Force in

order to compete for the contract).  But see Comdisco v. Gen. Servs. Admin., 864 F. Supp. 510,

517 n.17 (E.D. Va. 1994).  Although these decisions are also based on the language of the

particular solicitations at issue, the terms of the present solicitation do not warrant a departure

from this line of precedent.  The language of the solicitation supports the conclusion that pricing

information was required for this particular proposal.  See, e.g., Admin. Rec. Exh. 27 at 11

(identifying price as a factor that shall be considered by the government in connection with the

Air Force's solicitation); Admin. Rec. Exh. 29 at 2 § M-001 (same); Admin. Rec. Exh. 29 at 3 §

M-002 (same); Admin. Rec. Exh. 28 at 2 § 1.0 (stating that response to the Air Force's

solicitation must include all requested information); Admin. Rec. Exh. 28 at 5 § 5.0 (identifying

price as a requested factor for the Air Force's solicitation and specifying the format in which

pricing information must be submitted); Admin. Rec. Exh. 28 at 6 § 6.0 (describing requirements

for pricing information to be submitted in responses to the Air Force's solicitation).  Accordingly,

the information was involuntarily submitted and the burden is on plaintiffs to show that

disclosure is likely either to impair the government's future interests or to cause plaintiffs to

suffer substantial competitive harm.

A.    *The Air Force's Decision that Disclosure is Unlikely to Impair the Government's Future Interests*

With respect to the "impairment inquiry," the Air Force argues that there is little room for courts to second-guess the government's assessment of its own interests.  See, e.g., General Elec. Co. v. NRC, 750 F.2d 1394, 1402 (7th Cir. 1984); Comdisco, 864 F. Supp. at 515; McDonnell Douglas, 981 F. Supp. at 15-16.  However, this Court does not interpret this line of cases as endorsing blind acceptance of the government's vague and unsupported contentions.  In fact, the D.C. Circuit in McDonnell Douglas squarely held that an agency must "explain how its knowledge or experience supports [its] understanding" that its future interests will not likely be impaired, and makes clear that conclusory statements are deemed "arbitrary and capricious."  375 F.3d at 1191.

The Air Force disposed of plaintiffs' arguments by claiming that it, as a government entity, was "in the best position to determine" whether its own interests would be harmed.  Admin. Rec. Exh. 14 at 8.  The sole support for this assertion was a reference to earlier pages of the decision letter addressing the history of FOIA and procurement regulations, which concluded that this type of information had been released by the government for more than forty-five years.[5]  Id.  The logic behind the conclusion was that because the Air Force's interpretation supported the view that such information was not protected by Exemption 4, it had consistently followed a practice of releasing the information; therefore, a continued adherence to the disclosure practice

_____

[5]Defendant's original decision letter is similarly conclusory, dismissing plaintiffs' argument because "based upon [its] experience in government contracting, [the Air Force] do[es] not anticipate [that] disclosure of the requested information will likely impair [its] ability to obtain contract unit prices or subcontracting goals on future acquisitions."  Admin. Rec. Exh. 10 at ¶ 2.

was unlikely to cause future impairment for the government.  See id.  The missing link in this chain of analysis is any nexus between the practice allegedly supported by the Air Force's legal interpretation and actual implementation of such a disclosure practice over the past forty-five years.   Quite simply, the record is devoid of any evidence that the Air Force has actually disclosed this type of information, as it claims, on a consistent basis. The burden to produce such evidence rests with the Air Force, because it -- not plaintiffs -- has access to all relevant information and documentation regarding prior bids and disclosures.  See McDonnell Douglas, 375 F.3d at 1191 n.5.  Instead of merely asserting an alleged disclosure practice based on a novel interpretation of the history of procurement regulations and FOIA, the Air Force needed to provide evidence of other situations in which similar information has been routinely released. The Court need not accept the Air Force's conclusory statement of what its practice has been, or of what it believes the law allows, without any evidence or support that the practice has actually been followed.  Where, as here, "a declaration of fact . . . is 'capable of exact proof' but is unsupported by any evidence," the determination is arbitrary and capricious.  Id. at 1191 & n.4. The Air Force's bald assertions are "declaration[s] of empirical fact" -- not "predictive judgment[s]" -- to which the Court will not defer.  Id. at 1191 n.4.

On first blush, it also seems that the Air Force failed adequately to consider plaintiffs' argument that disclosure would harm the integrity of the negotiated procurement process because Mr. Ford, a former government employee who allegedly had access to plaintiffs' sensitive pricing and cost information during his government tenure, had subsequently joined the management ranks of Sabreliner.  To be sure, as Mr. Ford's employer -- and the custodian of plaintiffs' sensitive information -- at the time in question, the government may be in the best position to

determine whether or not plaintiffs' allegations are true.  Hence, it was incumbent upon the government to entertain and fairly assess plaintiffs' concerns.  Arguably, the Air Force did not do so, choosing instead summarily to reject plaintiffs' arguments without any indication of having researched them.  Essentially, the Air Force shifted the burden to plaintiffs, and then looked no further.  See Admin. Rec. Exh. 17 ("You also expressed concerns based on speculation about a former government employee.  I have considered your allegations but no evidence has been presented to warrant a change in my decision."); Admin. Rec. Exh. 10 at ¶ 2(d) (stating that "[w]e have no reason to believe this employee accessed Orenda's sensitive cost and pricing information").

The Air Force has not provided any analysis or facts to support its conclusions regarding Mr. Ford.  Tellingly, neither decision letter claims that the Air Force ever investigated the situation at all. The statement that "[e]ven if [Mr. Ford] did [access Orenda's sensitive cost and pricing information], release of these contract unit prices would not broaden the scope of his understanding of Orenda's sensitive cost and pricing information" is somewhat conclusory and fails to explain why disclosure would not augment any pre-existing basis of knowledge.  Admin. Rec. Exh. 10 at ¶ 2(d).  But the fault does not lie with the Air Force alone.  It is plaintiffs' burden to support the claim that disclosure of cost and pricing information to Mr. Ford would create some unique threat to sensitive cost and pricing strategies.  Beyond simply saying so, plaintiffs have not done so.  After all, if Mr. Ford has seen the information before, then disclosure would not seem to pose any real threat.  Furthermore, Mr. Ford is not the only one (at Sabreliner or elsewhere) with an understanding of the industry dynamics, or who plaintiffs contend could use the information to harm plaintiffs.

Perhaps plaintiffs' real lament is that a significant government official with some knowledge of their relevant cost and pricing information could wind up in an important position with a key competitor at all. That is the gist of their "harm to the integrity of the procurement process" claim. But this reverse-FOIA lawsuit cannot address that situation. In the end, then, it is plaintiffs who have failed adequately to support their claim of a unique threat of harm from disclosure based on Mr. Ford's employment at Sabreliner.

Finally, the second decision letter never establishes that the type of information allegedly releasable all along under the procurement regulations is the same type of information at issue in this case. The decision letter makes use of the amorphous term "contract prices," failing to analyze whether the information is, for example, "cost breakdown" information (which, as detailed below, is protected from disclosure by the plain language of the FAR -- regardless of the Air Force's interpretation of FOIA and procurement regulation history) or "unit price" information (which may be disclosed under the FAR so long as it is not conceivably protected by Exemption 4, see MCI Worldcom, 163 F. Supp. 2d at 34-35; Mallinckrodt v. West, 140 F. Supp. 2d 1, 7 (D.D.C. 2000)). Later portions of the decision letter switch to the term "contract award unit prices" without addressing the relevant distinctions. As the government now concedes, the label assigned to the information is not trivial -- "unit price" information may, under certain circumstances, be treated very differently from "cost breakdown" information. See Gov't Suppl. Br. at 4; see also MCI Worldcom, 163 F. Supp. 2d at 33. But this distinction was not developed at the administrative level.[6] The decision letter only foreclosed the possibility of the information

---

[6]The Court need not remand to the Air Force for consideration of this issue, however, because, as discussed below, FAR §§ 15.503 and 15.506 essentially codify the Exemption 4 standard. See MCI Worldcom, 163 F. Supp. 2d at 34-35 (stating that "the unmistakable meaning of FAR §§

being labeled "cost or pricing data" within the definition set forth in FAR § 2.101. Admin. Rec. Exh. 14 at 1; see also Govt' Suppl. Br. at 3-4 & n.1. That, however, is not particularly useful to the Court, as plaintiffs do not appear to argue that the information is "cost or pricing data" within FAR § 2.101. The agency's failure to address this issue means that the Air Force's decision was not based on a consideration of all relevant factors and may amount to a clear error of judgment. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).

Still, the most significant defect in the Air Force's decision remains that it was reached through an analytical framework that disregards applicable D.C. Circuit precedent. To begin with, the Air Force's decision largely ignores the recent McDonnell Douglas decision, as discussed further below. Moreover, under National Parks I, an Exemption 4 analysis considers whether the information is commercial or financial, obtained from a person, and privileged or confidential. See Nat'l Parks I, 498 F.2d at 766. Where, as here, the information was a required submission, the privileged or confidential question also incorporates an inquiry whether disclosure is likely either to impair the government's future ability to obtain necessary information or to cause plaintiffs to suffer substantial competitive harm. See Nat'l Parks I, 498 F.2d at 770; Critical Mass, 975 F.2d at 878. Through its skewed interpretation of the history of FOIA and the procurement regulations, the Air Force has attempted to redefine the scope of Exemption 4 into something narrower than envisioned by the D.C. Circuit.

_____

15.503 and 15.506 is that unit price information may be disclosed, but only insofar as it does not consist of trade secrets, confidential business information or is otherwise exempt from disclosure under the FOIA, Exemption 4"); Mallinckrodt, 140 F. Supp. 2d at 7 (stating that "[the FAR] do no more than require the disclosure of [unit price] information unless its disclosure would reveal information that is exempt under the FOIA"). Because the Court concludes that the information at issue is protected by Exemption 4, it is therefore also protected by the FAR.

Congress has never delegated to the Air Force -- or any other agency -- the authority to create a body of FOIA law that would strictly curtail the "reverse-FOIA" cause of action.  See Tax Analysts v. I.R.S., 117 F.3d 607, 613 (D.C. Cir. 1997) (stating that "no one federal agency administers FOIA," and the statute's meaning "should be the same no matter which agency is asked to produce its records"); Reporters' Comm'n for Freedom of the Press v. United States Dep't of Justice, 816 F.2d 730, 734 (D.C. Cir. 1987) (noting that "no one executive branch entity is entrusted with [FOIA's] primary interpretation"), rev'd on other grounds, 489 U.S. 749 (1989); see also Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n, 194 F.3d 72, 79 n.7 (D.C. Cir. 1999).  FOIA was meant to create a comprehensive and uniform balance between the competing policies of maintaining an informed citizenry and fostering government accountability, on the one hand, and protecting legitimate privacy and security interests of entities and individuals, on the other.  See Al-Fayed v. CIA, 254 F.3d 300, 306, 307 (D.C. Cir. 2001) (stating that "FOIA's terms apply government-wide" and clarifying that the development of agency-specific standards is inappropriate).  Although exemptions generally create a permissive withholding scheme, an agency is required to invoke an exemption when another statute (here, the TSA) affirmatively protects the requested information from disclosure.  This is the very genesis of the "reverse-FOIA" cause of action.[7]

---

[7]The Air Force's analytical framework amounts to a per se rule that the type of information at issue here is never exempt under Exemption 4.  That result is, of course, expressly rejected by McDonnell Douglas.  375 F.3d at 1192.

B.      *The Air Force's Conclusion that Disclosure Is Unlikely to Cause Plaintiffs*
        *to Suffer Substantial Competitive Harm*

The second way to qualify involuntarily-submitted information as "privileged or

confidential," and hence within Exemption 4, is to prove that its disclosure would likely cause

plaintiffs to suffer substantial competitive harm.  Plaintiffs' fear is that disclosure of its cost and

pricing information could enable competitors to match or undercut their pricing, which would

allow competitors to submit more attractive, unsolicited proposals for the option-year work.

According to plaintiffs, the government could then either accept these unsolicited proposals or

use them as a reason to test the market by issuing a new solicitation for the option-year work.

Plaintiffs further contend that disclosure could jeopardize their competitive position (on a

national and international scale) by allowing competitors to discern their pricing method, which

would facilitate the forecasting and undercutting of plaintiffs' offers in future procurements.  To

support their arguments in this regard, plaintiffs submitted the Bayley Memorandum, as well as

other written materials from counsel, containing examples of how competitors could use the

information to ascertain key components of plaintiffs' pricing strategy.   Ultimately, the Court

need not consider plaintiffs' arguments regarding future procurements because it rejects the Air

Force's analysis with respect to option-year J85 work.[8]

----

[8]The Air Force's analysis regarding future procurements may be more convincing.  Although
plaintiffs submitted an affidavit and several memoranda containing specific, arithmetic examples
and calculations to show how competitors would be able to deconstruct plaintiffs' pricing
formula, the Air Force carefully considered -- and rejected -- each one, using specific and
illustrative reasoning.  It may well be that disclosure would facilitate the reverse-engineering of
plaintiffs' pricing strategy.  The burden was on plaintiffs, however, to show that such an
occurrence was not merely possible, but likely.  The examples plaintiffs chose for support were
not the most convincing illustrations.  The Air Force highlighted their shortfalls and the ease with

With respect to the option-year work, plaintiffs submit that disclosure would cause substantial competitive harm in two ways: (1) competitors could submit unsolicited, lower bids to the Air Force, which the Air Force could then accept, or (2) if the Air Force chose to re-bid the option-year work, then competitors could respond with offers that undercut plaintiffs' prices.  The Air Force rejected plaintiffs' first argument on the rationale that unsolicited bids "based on price alone" could not be considered because they do not meet the definitions of an "unsolicited proposal" or "valid unsolicited proposal" under FAR § 2.101 and Subpart 15.6, respectively. Admin. Rec. Exh. 14 at 11.  FAR § 2.101 defines an "unsolicited proposal" as "a written proposal for a new or innovative idea that is submitted to an agency on the initiative of the offeror for the purpose of obtaining a contract with the Government, and that is not in response to a request for proposals . . . or any other Government-initiated solicitation or program."  Subpart 15.6 sets forth the criteria for accepting, evaluating, and rejecting such unsolicited proposals.  FAR § 15.600.  Under FAR § 15.603(c), an unsolicited proposal is invalid if it is not "innovative and

---

which subjective variables that factor into the cost analysis could cause a seemingly small mistake that would result in a substantial miscalculation of plaintiffs' future offer.  See Acumenics Res. & Tech. v. Dep't of Justice, 843 F.2d 800, 808 (4th Cir. 1988) (upholding agency's decision to release unit pricing information because there were "too many unascertainable variables in the unit price calculation" to enable a competitor to ascertain accurately plaintiff's formulaic multiplier, and therefore to inflict substantial competitive harm). Although "pinpoint precision is not required to inflict substantial competitive harm," McDonnell Douglas, 375 F.3d at 1193, such refutations show that plaintiffs' arguments do not support a finding that competitors are likely, in the circumstances of this case, to predict with sufficient precision plaintiffs' future pricing.  This does not pave the way for the development of a per se rule strongly condemned in McDonnell Douglas, because it is a result that flows directly from the plaintiffs' failure in this particular case convincingly to support their contentions.  The result is, accordingly, consistent with the observation in McDonnell Douglas that whether "disclosure of such pricing information is . . . required in this case turns upon the particular facts that make disclosure here '[un]likely . . . to cause substantial harm to the competitive position of [plaintiffs].'"  Id. at 1193 (citing Nat'l Parks I, 498 F.2d at 770).

unique," or if it "address[es] a previously published agency requirement."

If one of plaintiffs' competitors submitted an unsolicited proposal for the option-year work, the proposal would not be innovative or unique, and clearly it would address a previously published agency requirement. Hence, as the Air Force argues, it could not be accepted by the government. But this does not mean that such a proposal is unlikely to cause plaintiffs to suffer substantial competitive harm. The mere submission of such a proposal could alert the Air Force to the possibility of cost savings, and could induce the Air Force to re-bid the option-year work.

In this way, plaintiffs' two arguments are actually intertwined, and the reasonableness of the Air Force's conclusion regarding the first is dependent on its analysis of the second argument. Here, the Air Force's decision breaks down. Relying on FAR § 17.207(c), the Air Force claims that options are regularly exercised "unless funds are not available to fund the requirement or the incumbent's performance was less than satisfactory." See Admin. Rec. Exh. 14 at 11. But this conclusion rests on an unconvincing interpretation of that provision. FAR § 17.207(c) merely sets forth the conditions under which a contracting officer may exercise an option. It does not mandate -- or even express a preference for -- the exercise of options, and it never alludes to a regular course of action by the government. Indeed, the provision expressly states that options may not be exercised unless they are determined to be "the most advantageous method of fulfilling the government's need," and specifically directs the government to consider price when making that determination. FAR § 17.207(c)(3). Moreover, the Air Force neglected to consider the import of FAR § 17.207(d)(1), which specifically contemplates "testing the market" through the issuance of a new solicitation. Although a new solicitation should not be issued "[i]f it is anticipated that the best price available is the option price or that [the option] is the more

-34-

advantageous offer," id., that is not the situation plaintiffs fear. Plaintiffs are troubled by the possibility of a competitor obtaining sensitive pricing and cost information, and using it to draw up and submit a lower-priced proposal that then prompts the government to issue a new solicitation. Under such circumstances, it appears that the FAR actually prefers the issuance of a solicitation, and there is certainly nothing in the FAR to suggest that such action would be rare. Hence, the FAR provisions themselves do not support defendant's contention that it "has no practice of issuing new solicitations to test the market" and "regularly and routinely exercises" options.

According to the Air Force, plaintiffs' argument of substantial competitive harm fails because they did not present evidence that the Air Force has previously chosen not to exercise options in its dealings with plaintiffs, or that the government generally follows "a pattern of such action." Admin. Rec. Exh. 14 at 11. But this is another circumstance in which the Air Force improperly shifted the burden to plaintiffs. To begin with, plaintiffs have never argued that the Air Force follows a pattern of re-bidding option work, nor did they contend that the Air Force had previously done so with respect to plaintiffs' contracts. Rather, plaintiffs claimed that the Air Force could do so with respect to this contract, because nothing requires the government to exercise options.

The Air Force's bald assertions of "past practice" to the contrary are insufficient under McDonnell Douglas. Phrases like "based on past practice" and "based on our experience" do not flip a switch that mandates blind deference by the Court. As the entity that decides whether to exercise an option, the Air Force is in the best position to produce evidence to support its contentions that it "regularly and routinely" does so. Indeed, this is a statement of empirical fact

that, if true, is quite capable of substantiation.  See McDonnell Douglas, 375 F.3d at 1191 n.6.  It

was the Air Force's responsibility, then, to establish its automatic exercise of options based upon

the alleged rarity of "market conditions . . . so favorable that they would outweigh the need for

continuity of operations, potential costs of disrupting operations, and the risk that recompetition

would not be overall advantageous to the government."  Admin. Rec. Exh. 14 at 11.

Indeed, the Air Force's unsubstantiated rationale is essentially a repackaging of the

familiar "price is one of many factors" argument that has been unequivocally rejected by the D.C.

Circuit on at least two prior occasions.[9]  See McDonnell Douglas, 375 F.3d at 1189-90 (stating

that "[because] price is the only objective, or at least readily quantified, criterion among the six

criteria for awarding government contracts, submitting the lowest price is surely the most

straightforward way for a competitor to show that its bid is superior"); McDonnell Douglas v.

NASA, 180 F.3d 303, 306 (D.C. Cir. 1999).  The Air Force itself acknowledges the importance

of price when it states that

> [t]his is a requirements contract, which means that the government would be billed under
> the contract using delivery orders that vary in amount depending on the type and amount
> of work to be done.  The total annual contract amount is an estimate of the work that will
> be required during that period.  Review of unit prices under the contract is essential in
> evaluating the proposals for this contract.

Admin. Rec. Exh. 14 at 8.  Accordingly, the very reasons why plaintiffs were required to submit

the information at issue also support the conclusion that price is the most significant factor

_____

[9]The Air Force's first decision letter expressly stated that "price is just one of many factors
considered[, which] means [that] the effect of undercutting and ratcheting down would be diluted
by the other factors and the likelihood of competitive harm would be greatly reduced."  Admin.
Rec. Exh. 10 at 3-4 ¶ 2(b)(4).

considered during the bid evaluation process.

Hence, "the decision of the Air Force is neither 'at least as compelling as [that of plaintiffs'],' nor 'well-reasoned, logical[,] and consistent; it is, in short, arbitrary and capricious.'" McDonnell Douglas, 375 F.3d at 1191 (internal citations omitted).  It hardly seems unlikely that a competitor might seek to obtain a contract for option-year work by submitting a "more advantageous offer."  The Air Force has not argued otherwise, and has failed to provide any evidence to support a finding that such an offer would be extremely unlikely to prompt it to test the market.  Indeed, the FAR makes clear that if the Air Force did so, it would absolutely accept "the more advantageous offer."  The Court is not persuaded by the Air Force's unsupported speculation that consideration of "other factors" -- none of which appear to be as readily quantifiable or objective as price, and none of which (unlike price) are required considerations, see FAR §§ 17.207(d), (e) (mandating the consideration of price as well as a nebulous category of "other factors," and stating that consideration of "other factors . . . should take into account the Government's need for continuity of operations and potential costs of disrupting operations" (emphasis added))  -- would likely result in plaintiffs' option-year offer being deemed "the more advantageous offer" under § FAR 17.207(d)(1).  The Air Force's current packaging of this "price is one of many factors" argument is no more persuasive here than it was in McDonnell Douglas.  "Disclosure of [plaintiffs'] option year prices would likely cause [plaintiffs] substantial competitive harm by informing the bids of its rivals in the event the contract is rebid.  Consequently, the option year prices fall within the scope of Exemption 4, and the decision of the Air Force to release them was contrary to law."  McDonnell Douglas, 375 F.3d at 1190.

C. *Application of McDonnell Douglas*

The question remains, then, whether the assessment set out above is true to the D.C. Circuit's most recent foray into the area in <u>McDonnell Douglas</u>. There, three categories of information were at issue: (1) option year line-item prices, which are the projected line-item prices for work performed during the optional term of the contract, following the completion of the contract's base period; (2) vendor pricing CLINs, defined as the costs of materials and services procured from other vendors during the contract term; and (3) over and above work CLINs, that is, the "fixed hourly labor rates" for the maintenance and repair work that is not required under the contract, which the Air Force is not mandated to direct to the contractor. Plaintiffs in this case contest the release of all option year line-item pricing, as well as some base year line-item pricing, and the release of over and above work CLINs (or "fixed hourly labor rates"). Vendor pricing CLINs, in this case referenced as :pricing and price-related information in the subcontracting plan," are not at issue. In <u>McDonnell Douglas</u>, of course, the court upheld the Air Force's release of over and above work CLINs, but held that option year prices and vendor pricing CLINs could not be released.

<u>McDonnell Douglas</u> considered arguments that were specifically crafted with respect to these categories of information. <u>See</u> 375 F.3d at 1187-91. Here, however, the parties have treated the specific categories of information as if they are a single, larger genus of information referred to as either "unit pricing" or "line-item pricing."[10] The Air Force seeks to disclose the

_____

[10]An exception is the "fixed hourly labor rates for over and above work CLINs" category. In <u>McDonnell Douglas</u>, the plaintiff argued that a competitor with knowledge of the "over and

-38-

entirety of this material, and plaintiffs seek to withhold it all.  In essence, then, each party is

arguing for the type of broad rule rejected by the D.C. Circuit in <u>McDonnell Douglas</u>.  <u>See id</u>. at

1192, 1193.  Nearly all of the arguments that the parties advance in this case were also raised in

<u>McDonnell Douglas</u>, but the D.C. Circuit declined to consider some of them because they had

--------------------------------

above work CLINs" could use the information to craft a more attractive bid for the performance
of that work.  375 F.3d at 1191-92.  Because plaintiff had not advanced that argument below, the
court refused to consider it.  <u>Id</u>.  Plaintiff alternatively claimed knowledge of the CLINs "would
clearly place such a competitor at a distinct advantage over [plaintiff] in any contract
(commercial or military) awarded on the basis of a price comparison."  <u>Id</u>.  According to
plaintiff, local newspaper articles stated that plaintiff paid the "going wage" at a particular Air
Force base; hence, it feared that release of the over and above work CLINs would enable
competitors to calculate the company's "overall markup (or labor pricing factor)."  <u>Id</u>. at 1192.
The D.C. Circuit rejected this argument, finding instead that the articles only addressed the wage
for an "average blue collar worker" at the base; they did not reveal anything about the prevailing
wage for the employees performing work under the contract at the particular service center of the
base.  Moreover, the articles addressed only salary, not vacation or retirement benefits.  <u>See id</u>.
Accordingly, the information supplied to the Air Force was deemed insufficient to show
substantial competitive harm.  <u>Id</u>.

     In the present case, plaintiffs make the same type of argument, but with a slight twist.
They assert that Orenda is an International Association of Union Machinists shop, and that
competitors' employees could (through their union memberships) learn the negotiated wage rate.
<u>See</u> Admin. Rec. Exh. 14 at 15; Admin. Rec. Exh. 7 at 8-9.  The combination of these negotiated
pay rates and the fixed hourly labor rates for over and above work CLINs would allegedly enable
competitors, through arithmetic calculations, to determine plaintiffs' "overhead rates."  <u>See</u>
Admin. Rec. Exh. 14 at 15; Admin. Rec. Exh. 7 at 8-9.  Specifically, plaintiffs argue that "[i]f
competitors had access to both labor rates and line-item pricing data, and given the fact that the
cost of material is relatively similar for all companies, they could very simply deduce Orenda's
overhead rates."  Admin. Rec. Exh. 7 at 9.  Much like the argument rejected in <u>McDonnell
Douglas</u>, plaintiffs' contentions assume too much.  It may well be <u>possible</u> for union members to
learn the negotiated pay rates and to communicate them to one of plaintiffs' competitors, and for
that competitor then to calculate plaintiffs' overhead rates.  But plaintiffs have not offered any
evidence that this multiple-step occurrence is <u>likely</u>, which is the applicable standard here.
Moreover, plaintiffs' argument depends upon the release of the "line-item pricing" information,
which this Court is not ordering.  Any competitive harm, then, does not flow from the release of
the fixed hourly labor rates themselves, but rather from the release of that information coupled
with the release of the line-item pricing information.  Hence, consistent with <u>McDonnell
Douglas</u>, the Court will uphold the Air Force's decision that substantial competitive harm is not
likely to result from the disclosure of fixed hourly labor rates for over and above work CLINs.

not been presented at either the district court or administrative level. Here, in contrast, this Court is called upon to consider the merits of several arguments that were not fully considered in McDonnell Douglas.

McDonnell Douglas focused on the "substantial competitive harm" prong of Nat'l Parks. With respect to the option-year line-item pricing in that case, the plaintiff argued that in the event that the Air Force decided not to exercise the options, competitors could use the information to undercut its pricing in the re-bidding process. The Air Force countered that options are usually exercised, and that under the FAR the contract could not be rebid unless market conditions changed considerably. The D.C. Circuit declined to consider these arguments because they were presented for the first time on appeal. See id. at 1188. The parties have advanced the same arguments again here. As explained above, the Court ultimately finds that the Air Force's position is unpersuasive, because the FAR provisions do not express any preference for exercising options and the Air Force has failed to provide evidence to support its alleged past practice of routinely exercising options.

The plaintiff in McDonnell Douglas likewise argued that the requested information could be used by competitors preemptively to convince the Air Force to re-bid the option work. The D.C. Circuit determined that the plaintiff had not raised this argument below, and declined to consider it. See 375 F.3d at 1187-88. Here, plaintiffs make that same argument, and the Air Force claims that, under the FAR, it could not consider such an unsolicited proposal. The Court concludes that the Air Force is correct, because a preemptive offer of this nature would not be a "valid unsolicited proposal" under the FAR. That does not mean, however, that plaintiffs are unlikely to suffer competitive harm, because a preemptive offer would nonetheless alert the Air

Force to the possibility of cost savings, which could influence it to test the market. As discussed above, the FAR does not prefer the exercise of options over the re-bidding of option work -- indeed, there is actually a preference for re-bidding when the government has reason to believe that exercising an option would not be the most advantageous course of action. Essentially, then, this scenario also presents a likelihood of substantial competitive harm.

Similarly, the court in McDonnell Douglas refused to consider the Air Force's contention that any proposed prices from a competitor would have to offset the transaction costs associated with changing contractors (such as an interruption in service) in order to convince the Air Force not to exercise an option because the point was raised for the first time on appeal. See id. at 1188-89. The Air Force now makes the same argument here. Ultimately, this Court is unpersuaded, however, because the FAR merely suggests that such considerations "should" be taken into account, not that such a finding is required in order to decline to exercise an option. Moreover, the Air Force has presented no evidence that it has followed a practice of requiring such a finding notwithstanding the FAR's permissive language.

Finally, the Air Force in McDonnell Douglas argued that any substantial competitive harm would be mitigated by the fact that price is only one of many factors that must be considered. The D.C. Circuit in McDonnell Douglas relied upon its earlier decision in NASA, 180 F.3d at 306, to reject this argument, stating that price is the only factor that explicitly must be considered by law, and is the only objective factor taken into account. See 375 F.3d at 1189, 1190. The Air Force presses this argument here as well, but by subtly repackaging it to focus on transaction costs and changed market conditions. Although transaction costs and changed market conditions may be factors that the Air Force should consider, price is the only factor that it must

consider, and the Air Force has offered no evidence of a more objective factor than price. Accordingly, the Court has rejected the "price is just one of many factors" argument just as it was rejected in McDonnell Douglas.

This Court has not used McDonnell Douglas to create a strict mandate or per se rule. Rather, the Court's decision is driven by the shortfalls in logic and evidence that characterize the Air Force's administrative decision in this case.  Specifically, the Air Force has failed to support several conclusory assertions of empirical fact, has unreasonably interpreted various FAR provisions, and has divined a new Exemption 4 standard while declining to follow the legal framework established by the D.C. Circuit, instead relying heavily on ambiguous legislative history of FOIA and the FAR that has never factored into the Exemption 4 analysis.  The analysis by the D.C. Circuit in McDonnell Douglas, in short, which the Air Force would largely ignore, drives the conclusions reached here.

### III.     Does the TSA Prohibit Disclosure if the Information Is Within Exemption 4?

The D.C. Circuit has repeatedly stated that "the scope of the Trade Secrets Act 'is at least co-extensive with that of Exemption 4 of FOIA.'  Consequently, whenever a party succeeds in demonstrating that its materials fall within Exemption 4, the government is precluded from releasing the information by virtue of the Trade Secrets Act."  Widnall, 57 F.3d at 1164 (citing CNA Fin. Corp., 830 F.2d at 1151); see also McDonnell Douglas, 375 F.3d at 1185-86.   The Air Force contends that the meaning of this judicial language is as follows:  if the information fits within a listed category of the TSA, then it must be withheld from disclosure under FOIA Exemption 4.  See, e.g., Admin. Rec. Exh. 14 at 15, 16.  But such a construction defies the

common-sense interpretation of the language, to which courts have consistently adhered.  See,

e.g., Bartholdi Cable Co., Inc. v. FCC, 114 F.3d 274, 281 (D.C. Cir. 1997); Mallinckrodt, 140 F.

Supp. 2d at 4; MCI Worldcom, 163 F. Supp. 2d at 35; see also Osha Data/CIH, Inc. v. Dep't of

Labor, 220 F.3d 153, 167 n.31 (3d Cir. 2000); Frazee v. United States Forest Serv., 97 F.3d 367,

373 (9th Cir. 1996); Acumenics Res. & Tech., 843 F.2d at 804, 806-07 & n.6.  Hence, the scope

of the TSA is broad, "at least co-extensive" with Exemption 4, and if information is covered by

Exemption 4, it must be withheld because the TSA prohibits disclosure.  The government itself

has acknowledged that this is the law.  See FREEDOM OF INFORMATION ACT GUIDE & PRIVACY

ACT OVERVIEW, United States Department of Justice, 358-59 & nn.492-96, 867 & n.27 (May

2004 Ed.).

     Although the D.C. Circuit's interpretation of this interrelationship between Exemption 4

and the TSA has been described -- in dictum -- as possibly "no longer accurate in light of [the]

. . . more expansive interpretation of the scope of Exemption 4 [set forth] in Critical Mass,"

Widnall, 57 F.3d at 1165 n.2, it nevertheless remains the law.[11]  Even after Widnall, the D.C.

Circuit and sister circuits have consistently adhered to this interpretation.  See, e.g., Bartholdi

Cable, 114 F.3d at 281; Osha Data/CIH, 220 F.3d at 167 n.31; see also Parker v. Bureau of Land

Mgmt., 141 F. Supp. 2d 71, 77 n.5, 82 n.14 (D.D.C. 2001).  In its recent McDonnell Douglas

decision, the D.C. Circuit again confirmed, relying on its prior decisions in CNA and Widnall,

that the scope of the TSA is at least coextensive with Exemption 4, and that the TSA "effectively

---

[11]It is well-settled that a decision of the D.C. Circuit may only be overruled by either an en banc panel or the Supreme Court.  See, e.g., United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997).  This has not happened.

prohibits an agency from releasing information subject to the exemption." See 375 F.3d at 1185-86. Both this Court and the Air Force, then, are obliged to apply the law as it currently exists. Under that formulation, the terms of the TSA affirmatively preclude defendant from disclosing information that is protected by Exemption 4 of FOIA. For the reasons explained above, the information in this case is protected by Exemption 4. Hence, by the terms of the TSA, the Air Force may not disclose the information unless some other provision of law authorizes it to do so. 18 U.S.C. § 1905. The Air Force contends that disclosure is expressly authorized by the FAR.

## IV.    Does the FAR Authorize Disclosure Notwithstanding the TSA?

Relying on FAR §§ 15.503(b)(1)(iv), 15.506(d)(2), and 5.303(b)(2),[12] the Air Force argues that the FAR explicitly authorizes -- indeed, requires -- it to disclose "unit pricing information." Admin. Rec. Exh. 14 at 6. Plaintiffs, however, draw the Court's attention to FAR § 15.503(b)(1)(v), which specifically excepts "cost breakdowns" and trade secrets from the otherwise-applicable disclosure requirements of FAR § 15.503(b)(1)(iv). Similarly, plaintiffs submit that FAR § 15.506(d)(2) is limited by FAR § 15.506(e), which unequivocally unauthorizes the disclosure of " information . . . exempt from release under the Freedom of Information Act including  . . . commercial and financial information that is privileged and confidential, including . . . profit, indirect cost rates, and similar information." See also Pl.'s Suppl. Mem. at 2, 3.

The Court agrees that the Air Force has selectively quoted from the FAR and has

---

[12]It is unclear why the Air Force relies on § 5.303(b)(2). That provision applies when an agency has elected to make a local announcement to the media at the time the contract is awarded. Such circumstances are not, as far as the Court is aware, presented here.

misrepresented what the plain terms of the FAR require.[13]  Section § 15.506(e) codifies the <u>Nat'l Parks</u> standard for FOIA Exemption 4, which the Court has already determined protects the information in this case from disclosure.  See <u>Mallinckrodt</u>, 140 F. Supp. 2d at 5-6; <u>see also</u> <u>MCI Worldcom</u>, 163 F. Supp. 2d at 34 & n.7 (noting that "the underlying statute authorizing the FAR, namely the Federal Property and Administrative Services Act, 41 U.S.C. § 253(b) <u>et seq.</u>, as amended by the Federal Acquisition Streamlining Act ("FASA"), 41 U.S.C. [§] 253(b)(e)(3), specifically <u>prohibits</u> agencies from disclosing information that is subject to exemption under FOIA, including confidential and trade secret information falling within Exemption 4").[14]  The Air Force's strained and ultimately untenable interpretation of the FAR, achieved through reliance on some provisions to the exclusion of others that plainly qualify them, is the height of arbitrary and capricious decision-making.

## <u>CONCLUSION</u>

For the reasons stated herein, the Air Force's administrative decision reflected in its July 19, 2005 decision letter is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA, except with respect to fixed hourly labor rates for over and

---

[13]This appears to be an oft-employed strategy for the government.  See <u>MCI Worldcom</u>, 163 F. Supp. 2d at 34-35 (describing similar reliance on selective portions of FAR §§ 15.503 and 15.506 to the exclusion of other applicable -- and limiting -- provisions); <u>see also</u> <u>Mallinckrodt</u>, 140 F. Supp. 2d at 5-6.

[14]The Air Force's attempt to argue that these cases should not guide the Court's analysis because they do not address the history of the FOIA and the FAR as set forth in its decision letter is unconvincing.  The legislative history of the FOIA is, at best, ambiguous and inconclusive. Moreover, "[t]he FAR may not be interpreted in a way that contravenes [the] statutory prohibition on disclosure" that is contained in both the FAR and its authorizing statute.  See <u>MCI Worldcom</u>, 163 F. Supp. 2d at 34.

above work CLINs.  Accordingly, defendant's motion for summary judgment is granted in part

and denied in part, and plaintiffs' motion will also be granted in part and denied in part.  A

separate order has been posted on this date.

/s/    John D. Bates

JOHN D. BATES

United States District Judge

Dated:    August 3, 2006

Copies to:

Kristen Elizabeth Ittig
HOLLAND & KNIGHT LLP
2099 Pennsylvania Avenue, NW
Suite 100
Washington, DC 20006
(202) 955-3000
Fax: (202) 955-5564
Email: kittig@hklaw.com

Anand V. Ramana
HOLLAND & KNIGHT LLP
1600 Tysons Boulevard
Suite 700
McLean, VA 22102
(703) 720-8065
Email: anand.ramana@hklaw.com

    *Counsel for plaintiffs*

Oliver W. McDaniel
U.S. ATTORNEY'S OFFICE
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION
555 4th Street, NW
Washington, DC 20530
(202) 616-0739
Fax: (202) 514-8780
Email: oliver.mcdaniel@usdoj.gov

    *Counsel for defendant*